**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
R. Jason Richards (*Admitted Pro Hac Vice*)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com

(Additional Counsel on Signature Page)

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CROWN LABORATORIES BPO SALES AND MARKETING LITIGATION | Lead Case No. 3:24-cv-01448-EMC |
| This Document Relates To: | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| <u>All Actions</u> | |

Plaintiffs, Priscilla Garcia, Chinyere Harris, William Eisman, Michelle Hollins, Caitlyn Sheehan, Joseph Diamond, Lorrie Potter, Morgan Cratty, Aaron Corcoran, Kristen Davis, Leanne Campbell, Shannon Citrino, Lisa Lavarone, Erica Millbank, Destiny Jensen, Scott Linman, Noemi Gerena, Michael Taylor, Tiffany Snadowsky, Christina Stone, Marlena Timins, Trakiia Pierce, Erin Del Toro, Louisa Romo, Angelina Flores, Karen Hattley, Holly Grossenbacher, Latifah Abednego, Kayleigh Schneider, Jennifer Irizarry, Marilyn Saavedra, Emily Tam, Abdallah Al-Qudsi and Brett Gooden (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendant Crown Laboratories, Inc.

("Defendant" or "Crown"). Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a consumer class action brought on behalf of individuals who purchased PanOxyl® branded benzoyl peroxide acne treatment products ("BPO Products"). Plaintiffs seek to redress the economic injuries caused by Crown Laboratories, Inc. ("Defendant" or "Crown") arising from its manufacturing, distribution, marketing, and sale of BPO Products that contain and/or degrade into dangerously high levels of benzene—a known human carcinogen, impurity, and illegal adulterant.

2. The BPO Products are topical drugs used to treat acne vulgaris ("acne"), formulated with the active ingredient benzoyl peroxide ("BPO"). BPO is chemically unstable, and scientific literature and independent testing show that without adequate formulation, testing, and controls, it degrades into benzene under normal consumer use, handling, and storage conditions.

3. Benzene is a well-known human carcinogen linked to leukemia and other cancers. Indeed, for over a century, the scientific and regulatory communities have recognized benzene as a potent human carcinogen. Accordingly, benzene is not permitted in pharmaceutical products except in minimal amounts when its use is unavoidable. By incorporation of the United States Pharmacopeia ("USP") standards, the FDCA establishes a strict 2 parts per million (ppm) maximum limit for benzene in covered products.[1]

4. Throughout this Complaint, references to federal law and Food and Drug Administration ("FDA") regulations are merely to provide context and do not raise a federal question of law. All claims alleged herein arise out of violations of state law, which in no way

---

[1] 21 U.S.C. § 321(j); 21 U.S.C. § 351(b); U.S. Pharmacopeia, *General Chapter <467> Residual Solvents* at 3–4, tbl. 1, USP-NF Online (last visited Jan. 4, 2026).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

5.      Over-the-counter acne medications containing BPO are regulated under the FDA's Acne Drug Products Monograph ("Acne Monograph"), codified at 21 C.F.R. § 333.301. et seq., and are required to comply with the general conditions set forth in 21 C.F.R. § 330.1. Those conditions mandate compliance with the adulteration and misbranding provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"),[2] adherence to current Good Manufacturing Practices ("cGMPs"),[3] and conformity with applicable USP standards.[4]

6.      Defendant knew or should have known that the BPO Products[5] contain benzene and/or degrade to form benzene at the time of manufacturing the BPO Products.  Despite this knowledge, Defendant placed the BPO Products into the stream of commerce ending in the hands of consumers, who in turn put the misbranded and adulterated BPO Products directly on their skin as instructed. Thus, Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by selling an adulterated drug—due to (1) the presence of benzene, (2) failure to comply with cGMPs, and (3) proportion to sell a product that is governed by an official compendium and failed to meet those requirements—and by not including a disclosure of the presence of benzene or the ability of BPO to degrade into benzene on the BPO Products' labels or otherwise warning consumers about its presence.

7.      Plaintiffs and Class members reasonably relied on Defendant's representations that the BPO Products were an acne "treatment" that was safe to use as instructed, unadulterated, and free from dangerous levels of human carcinogens.

8.      Plaintiffs and Class members purchased the BPO Products, which have been found to contain harmful levels of benzene.

---

[2] 21 C.F.R. § 330.1(c)(1); 21 U.S.C. §§ 351, 352.
[3] 21 C.F.R. § 330.1(a); 21 U.S.C. § 351(a)(2)(B).
[4] 21 C.F.R. § 330.1(c); 21 U.S.C. § 351(b).
[5] The BPO Products refer to (1) PanOxyl® Acne Foaming Wash 10% BPO, (2) PanOxyl® Acne Creamy Wash Daily Control 4% BPO, and (3) PanOxyl Acne Treatment Bar 10% BPO.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

9.      The BPO Products are in fact worthless, because they contain benzene at levels that render the BPO Products adulterated, misbranded, and illegal to sell under applicable state laws.

10.      Defendant is therefore liable to Plaintiffs and Class members for manufacturing, producing, and selling BPO Products that contain elevated and dangerous levels of benzene, which render the Products adulterated and misbranded under state law.

## PARTIES

11.      Plaintiff Priscilla Garcia is a resident and citizen of San Francisco, California. Plaintiff purchased BPO Products in California during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from January 2023 to February 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

12.      Plaintiff Chinyere Harris is a resident and citizen of Fresno, California. Plaintiff purchased BPO Products in California during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, PanOxyl Acne Creamy Wash Daily Control 4% BPO, and PanOxyl Acne Treatment Bar 10% BPO, from February 2023 to April 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded.

4

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

13.    Plaintiff William Eisman is a resident and citizen of Warren County, Missouri. Plaintiff purchased BPO Products in Missouri during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO and PanOxyl Acne Creamy Wash Daily Control 4% BPO, from 2019 to 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

14.    Plaintiff Karen Hattley is a resident and citizen of Kansas City, Missouri. Plaintiff purchased BPO Products in Missouri during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO from Walmart in Kansas City, in approximately March 2023 and January 2024. One of the specific BPO Products purchased by Plaintiff has undergone independent testing and shown to contain benzene at levels that vastly exceed 2 ppm. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

15.    Plaintiff Michelle Hollins is a resident and citizen of Clark County, Nevada. Plaintiff purchased BPO Products in Nevada during the applicable class period, including PanOxyl Acne Foaming Wash Benzoyl Peroxide 10% BPO and PanOxyl Acne Creamy Wash Daily Control 4% BPO Daily, from approximately 2019 through 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

16.    Plaintiff Noemi Gerena is a resident and citizen of Bronx, New York. Plaintiff purchased BPO Products in New York during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately June 2022 to February 2024. When

6

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

17.    Following the public disclosures regarding BPO instability, Plaintiff Gerena had her personal, unused portion of five Panoxyl BPO Products independently tested by a qualified analytical laboratory. The analysis revealed that the products ranged from 733.38 ppm to a staggering 849.63 ppm of benzene.  This rendered her BPO products adulterated and misbranded due to the presence of illegal levels of benzene.

18.    Plaintiff Caitlyn Sheehan is a resident and citizen of Putman County, New York. Plaintiff purchased numerous BPO Products in New York during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from 2019 through April 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have

7

paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

19.    Plaintiff Joseph Diamond is a resident and citizen of New York County, New York. Plaintiff purchased BPO Products in New York during the applicable class period, PanOxyl Acne Foaming Wash 10% BPO, from approximately June 2021 through 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

20.    Plaintiff Lorrie Potter is a resident and citizen of Franklin County, Ohio. Plaintiff purchased numerous BPO Products in Ohio during the applicable class period, including PanOxyl Acne Treatment Bar 10% BPO, from 2014 to 2019. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

21.    Plaintiff Morgan Cratty is a resident and citizen of St. Petersburg County, Pennsylvania. Plaintiff purchased BPO Products in Pennsylvania during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately April 2020 to March 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

22.    Plaintiff Aaron Corcoran is a resident and citizen of Philadelphia County, Pennsylvania. Plaintiff purchased numerous BPO Products in Pennsylvania during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately June 2022 to April 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded. Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the

9

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

23.    Plaintiff Kristen Davis is a resident and citizen of Chester County, Pennsylvania. Plaintiff purchased numerous BPO Products in Pennsylvania during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO and PanOxyl Acne Creamy Wash Daily Control 4% BPO, from approximately 2019 to 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

24.    Plaintiff Leanne Campbell is a resident and citizen of Delaware County, Pennsylvania. Plaintiff purchased BPO Products in Pennsylvania during the applicable class period, including PanOxyl Acne Creamy Wash Daily Control 4% BPO, from approximately January 2024 to March 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of

10
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

25. Plaintiff Shannon Citrino is a resident and citizen of North Scituate County, Rhode Island. Plaintiff purchased BPO Products in Rhode Island during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO and PanOxyl Acne Treatment Bar 10% BPO, from approximately February 2019 to 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded. Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

26. Plaintiff Lisa Lavarone is a resident and citizen of Kent County, Rhode Island. Plaintiff purchased numerous BPO Products in Rhode Island during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, PanOxyl Acne Creamy Wash Daily Control 4% BPOl, and PanOxyl Acne Treatment Bar 10% BPO, from approximately 2019 to through 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

27.    Plaintiff Erica Millbank is a resident and citizen of Olympia, Washington. Plaintiff purchased BPO Products in Washington during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately June 2019 to 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

28.    Plaintiff Destiny Jensen is a resident and citizen of Pierce County, Washington. Plaintiff purchased BPO Products in Washington during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, PanOxyl Acne Creamy Wash Daily Control 4% BPO, and PanOxyl Acne Treatment Bar 10% BPO, from approximately 2019 to June 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of

12

the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded. Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

29.    Plaintiff Scott Linman is a resident and citizen of Maricopa County, Arizona. Plaintiff purchased BPO Products in Arizona during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately 2019 through 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded. Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

30.    Plaintiff Michael Taylor is a resident and citizen of Barnstable County, Massachusetts. Plaintiff purchased BPO Products in Massachusetts during the applicable class period, including PanOxyl Acne Foaming Wash Benzoyl Peroxide 10% BPO, from approximately 2018 through 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these

13

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

31.     Plaintiff Tiffany Snadowsky is a resident and citizen of Suffolk County, Massachusetts. Plaintiff purchased BPO Products in Massachusetts during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately May 2018 to March 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

32.     Plaintiff Christina Stone is a resident and citizen of Middlesex County, Massachusetts. Plaintiff purchased BPO Products in Massachusetts during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately 2019 to January 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties

14

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

33.    Plaintiff Marlena Timins is a resident and citizen of Worchester County, Massachusetts. Plaintiff purchased BPO Products in Massachusetts during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, from approximately February 2018 through April 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

34.    Plaintiff Angelina Flores is a resident and citizen of Raytown, Missouri. Plaintiff purchased BPO Products in Missouri during the applicable class period, PanOxyl® Acne Foaming Wash 10% BPO on or about July 2023 at Walmart in Jackson County, Missouri. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures,  and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

35.     Plaintiff Holly Grossenbacher is a resident and citizen of Chalmette, Louisiana, located in St. Bernard Parish. Plaintiff purchased BPO Products in Louisiana during the applicable class period, including PanOxyl® Acne Foaming Wash 10% BPO online from Walmart on or about 2023. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

36.     Plaintiff Erin Del Toro is a resident and citizen of Westminster, California. Plaintiff purchased BPO Products in California during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO at a Target store located in Westminster, California for $9.79 on or about January 29, 2024. The specific BPO Product purchased by Plaintiff has undergone independent testing and shown to contain benzene at levels that vastly exceed 2 ppm. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or

misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

37.     Plaintiff Louisa Romo is a resident and citizen of Hereford, Arizona. Plaintiff has purchased numerous BPO Products in Arizona during the applicable class period, including PanOxyl Acne Foaming Wash 10% BPO, which she purchased from a Target store in Phoenix, Arizona, and PanOxyl Acne Foaming Wash 10% BPO which she purchased on www.amazon.com for $9.48 on July 11, 2022.  When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

38.     Plaintiff Trakiia Pierce is a resident and citizen of New York, New York. Plaintiff has purchased numerous BPO Products New York during the applicable class period, including PanOxyl Acne Creamy Wash Daily Control 4% BPO, which she purchased from Amazon (via www.amazon.com) for $9.77 in April 2023. When purchasing the BPO Product, Plaintiff

17
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

reviewed the accompanying label and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

39.    Plaintiff Latifah Abednego is a resident and citizen of West Palm Beach, Florida. Plaintiff has purchased numerous BPO Products in Florida during the applicable class period, including PanOxyl Foaming Wash 10% BPO, which she purchased in March 2024 at a Walgreens store located in West Palm Beach, Florida. One of the BPO Products purchased by Plaintiff has undergone independent testing and shown to contain benzene at levels that vastly exceed 2 ppm. When purchasing the BPO Product, Plaintiff reviewed the accompanying label and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

40.    Plaintiff Kayleigh Schneider is a resident and citizen Middlesex County, Connecticut. Plaintiff has purchased numerous BPO Products in Connecticut during the applicable class period, including PanOxyl Acne Treatment Bar 10% BPO, from approximately 2019 to 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded. Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

41.    Plaintiff Jennifer Irizarry is a resident and citizen of Charles County, Maryland. Plaintiff has purchased numerous BPO Products in Maryland during the applicable class period, including  PanOxyl Acne Foaming Wash 10% BPO, PanOxyl Acne Creamy Wash Daily Control 4% BPO, and PanOxyl Acne Treatment Bar 10% BPO, from 2019 to March 2024. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have

paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

42.    Plaintiff Marilyn Saavedra is a resident and citizen of Baltimore County, Maryland. Plaintiff has purchased numerous BPO Products in Maryland during the applicable class period, including PanOxyl Acne Creamy Wash Daily Control 4% BPO, from September 2018 to April 2022. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

43.    Plaintiff Emily Tam is a resident and citizen of Cook County, Illinois. Plaintiff has purchased numerous BPO Products in Illinois during the applicable class period, including PanOxyl Acne Treatment Bar 10% BPO, from approximately 2019 through March 2024. When purchasing the BPO Product, Plaintiff reviewed the accompanying label and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

44.    Plaintiff Abdallah Al-Qudsi is a resident and citizen of DuPage County, Illinois. Plaintiff has purchased BPO Products in Illinois during the applicable class period, including PanOxyl Acne Foaming Wash Benzoyl Peroxide 10% BPO, from 2009 to 2023. When purchasing the BPO Product, Plaintiff reviewed the accompanying label and disclosures and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

45.    Plaintiff Brett Gooden is a resident and citizen of Sangamon County, Illinois. Plaintiff has purchased numerous BPO Products in Illinois during the applicable class period, including PanOxyl Acne Foaming Wash Benzoyl Peroxide 10% BPO, PanOxyl Acne Creamy Wash Daily Control 4% BPO, and PanOxyl Acne Treatment Bar 10% BPO, from 2019 to 2024. When purchasing the BPO Product, Plaintiff reviewed the accompanying label and disclosures,and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. The BPO products purchased by Plaintiff more likely than not had levels of benzene in them that rendered the drugs adulterated and misbranded.  Had Plaintiff known their BPO Products contained benzene at the time of purchase or that the Products

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

could degrade to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

46.     Standing is satisfied by alleging economic injury. Here, Plaintiffs suffered economic injury when they spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Members of the putative class have likewise suffered economic injuries in that they have spent money to purchase BPO Products they would not otherwise have purchased, paid less for, or paid for a product that was otherwise worthless/illegal for sale, absent Defendant's misconduct, as alleged herein.  Furthermore, there is sufficient similarity between the specific BPO Product purchased by Plaintiffs and the other BPO Products not purchased by Plaintiffs.[6] Specifically, each and every one of the BPO Products (i) are marketed in substantially the same way – as an acne treatment— and (ii) fail to include labeling indicating to consumers that the BPO Products contain benzene and/or degrade to form benzene. Accordingly, the misleading effect of all the BPO Products' labels are substantially the same.

47.     Plaintiffs and putative Class members have suffered a concrete and particularized injury, because they have been denied the opportunity to make informed financial and healthcare decisions due to the Defendants' misconduct. The decision to purchase or not purchase BPO products that contain or degrade to form benzene at any level is a financial and healthcare decision that affects Plaintiffs and members of the putative class in a very personal and individual way. By failing to disclose the presence of benzene in its BPO Products' labeling, Plaintiffs and individual members of the putative Class were denied the opportunity to make informed decisions, and instead unwittingly purchased and used BPO Products they would have not have otherwise purchased, or paid less for, absent Defendants' misconduct. Plaintiff's and the putative Class members' injuries are therefore traceable to Defendants' acts or omissions. Plaintiff and the

---

[6] *Astiana v. Dryer's Grand Ice Cream, Inc*., 2012 WL 2990766 at *13 (N.D. Cal. July 20, 2012); *Cimoli v. Alacer Corp*., 546 F.Supp.3d 897, 908-909 (N.D. Cal. 2021).

putative Class members also seek monetary damages to address the monetary harm caused by Defendants' actions, so there is a substantial likelihood that the relief sought will redress the injuries. As a result, Plaintiff and members of the putative Class have Article III standing.

48.    Defendant Crown Laboratories, Inc. is a Delaware corporation with its principal place of business at 207 Mockingbird Land, Johnson City, Tennessee 37604. Crown markets, distributes, and sells various skin care products, including PanOxyl® Acne Creamy Wash 4% BPO, PanOxyl® Acne Foaming Wash 10% BPO, and PanOxyl Acne Treatment Bar 10% BPO.

49.    Defendant markets, sells, and distributes the BPO Products throughout the United States and its territories. The BPO Products, including those purchased by Plaintiffs and Class members, are available for sale on Defendant's website (www.panoxyl.com), on third party websites (e.g. www.amazon.com), and are sold by various retailers, including Walmart, Walgreens, Target, and Ulta Beauty, both online and in their brick-and-mortar stores throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its BPO Products.

50.    All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

**JURISDICTION AND VENUE**

51.    This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 Class members and members of the Class are citizens of a state different than Defendant.

52.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed themselves of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

**I.    DEFENDANT'S HISTORY IN THE INDUSTRY**

53.    Fifty million Americans suffer from acne annually.[7] Acne is the most common skin condition in the United States with a prevalence among adolescents of almost 95 percent.[8] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[9] Millions of acne sufferers seek treatment every year making it a highly competitive, billion-dollar industry and a key business segment for Defendant Crown, who sells BPO Products under its private label PanOxyl.

54.    Defendant Crown dominates the acne treatment products' markets year after year. Defendant markets itself as "The Acne Authority," manufacturing BPO products for over fifty years, and serving millions of customers and patients every day both nationally and internationally.[10] Defendant produces the number-one best-selling acne face wash in the United States—the Acne Foaming Wash—which is among the BPO Products at issue in this litigation.[11]

55.    BPO Products represent one of Defendant's key acne treatment lines and a significant portion of its retail pharmacy revenues, giving Defendant a strong financial incentive to aggressively market these BPO Products despite known benzene degradation risks.

56.    Defendant manufactures, markets, distributes, and sells various skin care products, including PanOxyl® Acne Creamy Wash Daily Control 4% BPO, PanOxyl® Acne Foaming Wash 10% BPO, and PanOxyl Acne Treatment Bar 10% BPO.

57.    Benzoyl peroxide is an active ingredient in all the BPO Products. As such, it is an ingredient intended for use in the manufacture of the relevant Products.

58.    Defendant's BPO Products are widely used by children and teenagers as a standalone treatment or in combination with other BPO Products. Defendant knew that

---

[7] *Skin Conditions by the Numbers*, American Association of Dermatology (updated Feb. 11, 2025), https://www.aad.org/media/stats-numbers.
[8] JL Burton et al., *The prevalence of acne vulgaris in adolescence*, 85 Br. J. Dermatology 119, 120 (1971).
[9] *Id.*
[10] *About PanOxyl*, PanOxyl, https://panoxyl.com/about-panoxyl/ (last accessed Jan. 9, 2026).
[11] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

adolescents are the largest users with users as young as 7-10 years old. Defendant recommends that consumers, including children, use the BPO Products one to two times a day, over many months or longer for persistent acne.[12] Defendant knew that some consumers would use the BPO Products for many years starting in their teens. Because there is no cure for acne, Defendant knew that consumers with chronic acne would use the BPO Products repeatedly throughout their lifetime.

59.     This youthful user base is the result, in large part, of Defendant's targeted marketing and advertising of BPO Products to preteens, teens, and young adults. Many of Defendant's online and print advertisements featured children, teenagers, eye-catching props, music, and colors meant to attract young people and appeal to their interests.[13]

60.     By marketing the BPO Products directly to children and teenagers, and by providing assurances of safety and efficacy, Defendant knew that adolescents would use the BPO Products repeatedly over long periods, increasing the likelihood of exposure to any pervasive adulterants.

61.     And, indeed, benzene—a known human carcinogen—is a regular contaminating visitor of Defendant's BPO Products. As discussed in depth below, Defendant's BPO Products systematically degrade to form benzene when exposed to heat and time.

62.     The BPO Products at issue in this case contain or systematically degrade to form elevated levels of benzene. As referenced below, this allegation is supported by testing conducted by Valisure LLC ("Valisure"), which tested Defendant's PanOxyl® Acne Foaming Wash 10% BPO Product and found that it contained over 170 ppm benzene. These results have been published in peer-reviewed literature.[14] This allegation is also supported by independent testing conducted on certain of Plaintiff's individual BPO Products, as referenced above.

---

[12] *See, e.g., PanOxyl Acne Foaming Wash*, PanOxyl, https://panoxyl.com/acne-products/acne-foaming-wash-benzoyl-peroxide/ (last accessed Jan. 9, 2026).

[13] *See, e.g.*, *All About Teen Acne: Head Back to School with Clearer Skin*, PanOxyl (Oct. 2, 2025), https://panoxyl.com/about-panoxyl/.

[14] K. Kucera, et al., *Benzoyl Peroxide Drug Products Form Benzene*. 132 Environ Health Perspect. (Mar. 2024), https://doi.org/10.1289/EHP13984.

## II.    EVIDENCE OF BENZENE'S DANGER

63.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum.

64.    The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities agree that it is a known human carcinogen with severe consequences to human exposure.

65.    The World Health Organization ("WHO") recognizes that, "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[15] WHO specifically outlines that, "[b]enzene is a genotoxic carcinogen in humans."[16]

66.    The National Cancer Institute concurs, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[17]

67.    Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[18] As noted by the IARC, "In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence."[19]

68.    The Environmental Protection Agency ("EPA") also recognizes the cancer risks of benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A) under

---

[15] *Preventing Disease Through Healthy Environments: Exposure to Benzene: A Major Public Health Concern*, WHO (2019), https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.
[16] *WHO Guidelines for Indoor Air Quality: Selected Pollutants,* WHO (Jan. 1, 2010), https://www.who.int/publications/i/item/9789289002134.
[17] *Benzene*, Nat'l Cancer Inst. (last visited Jan. 4, 2026), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.
[18] *Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans* (2017: Lyon, France), at p. 33.
[19] *Id*. at 34.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the Risk Assessment Guidelines of 1986."[20] "[B]enzene is characterized as a known human carcinogen for all routes of exposure based on convincing human evidence as well as supporting evidence from animal studies."[21]

69.    A 2010 study titled "Advances in Understanding Benzene Health Effects and Susceptibility" summarized the epidemiological studies of the carcinogenic effects of benzene exposure and an overview of the hematotoxic effects of benzene. The 2010 study concluded: (a) there is probably no safe level of exposure to benzene; (b) exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process; and (c) benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.22

70.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[23] A toxicity assessment by the Centers for Disease Control and Prevention has shown benzene can harm the central nervous system and may affect reproductive organs.[24]

71.    The FDA and the National Institute for Occupational Safety and Health ("NIOSH"), part of the CDC, agree that "[e]ven in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[25] NIOSH further identifies the target organs for benzene exposure as: "eyes, skin,

---

[20] *Benzene*, Environmental Protection Agency, https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276 (last visited June 12, 2025).
[21] *Id*.
[22] *See generally,* Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 Annual Rev. of Pub. Health 133 (Apr. 21, 2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.
[23] *Benzene Chemical Fact Sheet*, CDC (Sep. 6, 2024) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[24] *Toxicology Profile*, supra note 11, at 93.
[25] Hudspeth, A., et al., *Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives*, 130 Env't Health Perspective (2002), https://pmc.ncbi.nlm.nih.gov/articles/PMC8963516/; *see NIOSH Pocket Guide to Chemical Hazards* (footnote continued)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

respiratory system, blood, central nervous system, bone marrow. Because of this, the CDC recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm.[26]

### III.    THE BINDING NATURE OF THE 2 PPM LIMIT

72.    Benzene is prohibited in pharmaceutical products except in trace amounts when its presence is unavoidable as part of the manufacturing process—which BPO does not qualify. Thus, under existing federal law, no detectable benzene should be found in BPO products. Furthermore, to extent benzene is unavoidable in BPO, the maximum amount of benzene that may lawfully be present in a drug product is 2 parts per million ("ppm"). The 2 ppm limit is a hard safety ceiling, not a discretionary guideline. Any product that exceeds 2ppm of benzene must be pulled off the market because it is considered an adulterated drug. This rule, which originated in FDA guidance, reflects the international scientific consensus embodied in ICH Q3C, and was adopted by the USP before being incorporated into federal law through the FDCA.

73.    Since July 1, 2008, compliance with USP General Chapter <467> Residual Solvents has been a statutory requirement under Section 501(b) of the FDCA.[27] As a result, USP standards governing drug quality and purity are binding under federal law. This statutory incorporation ensures that whenever a drug is recognized in the USP—such as benzoyl peroxide—the purity standards set forth in the USP monographs and general chapters become binding federal requirements.

74.    USP General Chapter <467> serves as the governing standard for identifying and quantifying organic volatile impurities in drug products, which specifically includes benzene, and, consistent with FDA guidance, classifies benzene as a Class 1 solvent—a category reserved for "solvents to be avoided" because benzene is a known human carcinogen that can cause cancer.[28] FDA guidance provides that "[s]olvents in Class 1 should not be employed in the manufacture of

---

- *Benzene*, NIOSH https://www.cdc.gov/niosh/npg/npgd0049.html (last accessed Jan. 4, 2026).
[26] *See NIOSH*, supra note 25.
[27] 21 U.S.C. 351(b); *see* 21 U.S.C. § 321(j) (defining "official compendium" as United States Pharmacopeia).
[28] *USP 467*, supra note 1, at 1.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

drug substances, excipients, and drug products because of [their] unacceptable toxicity," and USP <467> accordingly establishes a maximum concentration limit for benzene of 2 ppm in those products where benzene is unavoidable.[29] Consistent with that classification, the FDA requires manufacturers to strictly control benzene in drug products in accordance with ICH Q3C, cGMP, and USP standards, even for non-compendial drugs.  This interpretation of the Chapter 467 to all BPO product has been specifically recognized by USP in response to concerns about the presence of benzene in BPO products.[30]

75.    This 2 ppm benzene ceiling is further reinforced by USP General Notice 5.60.20, in which the USP mandated that "[a]ll USP and NF articles are subject to relevant control of solvents, even when no test is specified in the individual monograph," and that solvents be "limited according to the principles defined and the requirements specified in Residual Solvents <467>."[31]

76.    BPO is a drug recognized in an official compendium, the USP. The compendial status of BPO products therefore triggers mandatory compliance with USP General Chapter <467> and General Notice 5.60.20, even where no specific residual solvent test is listed in an individual monograph. The USP has issued official monographs for hydrous benzoyl peroxide, benzoyl peroxide lotion, and benzoyl peroxide gel, each of which is subject to these standards.[32]

77.    Chapter <467> makes clear that its requirements are not limited to solvents intentionally added during manufacture.[33] It defines residual solvents to include organic volatile

---

[29] *Id.* at at 3–4, tbl. 1; *Q3C Tables and List Guidance for Industry*, FDA at 5 (June 2017), https://www.fda.gov/media/71737/download.
[30] *Statement on Third-Party Laboratory Benzene Findings*, U.S. Pharmacopeia (Mar. 11, 2024), https://www.usp.org/news/statement-on-third-party-laboratory-benzene-findings.
[31] *General Notice 5.60.20 Residual Solvents in USP and NF Articles ¶ 5.60.20*, USP, https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalNoticesandRequirementsFinal.pdf (last accessed Jan. 4, 2026).
[32] United States Pharmacopeia, *Benzoyl Peroxide Lotion* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8310.html; United States Pharmacopeia, *Benzoyl Peroxide Gel* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8320.html; United States Pharmacopeia, *Hydrous Benzoyl Peroxide* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8330.html.
[33] *USP 467*, supra note 1, at 1.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

chemicals that are "used or produced" during the manufacture of drug substances or the preparation of drug products.[34] Accordingly, benzene formed as a degradant or byproduct of BPO is subject to the same 2 ppm limit and mandatory testing requirements as benzene introduced as a process solvent.[35]

78.     As discussed further below, consequently, a BPO product containing more than 2 ppm of benzene falls below the purity standard of the official compendium and is adulterated under 21 U.S.C. § 351(b).

## IV.     FDA WARNINGS AND ACTIONS REGARDING OF BENZENE CONTAMINATED PRODUCTS

79.     In addition to the statutory requirement, FDA warnings, communications, and regulatory actions confirm that 2 ppm is the limit. And, this is for good reason, because benzene exposures above 2 ppm have been linked to life threatening health issues.

80.     In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson. The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "exceed[s] the guideline value provided by ICH [Q3C] and USP 36" limits, states the report. The evaluation also noted that individuals with altered skin absorption (e.g., infants, elderly, broken skin) and those exposed to benzene from other sources may be at greater risk.[37]

81.     On December 27, 2023, following reports of benzene contamination in various drugs, the FDA published an "Alert" stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch

---

[34] *Id.*
[35] *Id.*
[36] The term "USP" refers to United States Pharmacopeia Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.
[37] *CDER Health Hazard Evaluation*, CDER (Apr. 6, 2020), https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

that contains benzene above 2 ppm . . . If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" The FDA specifically recognized that certain ingredients "may yield benzene under certain conditions" and that the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life." With that, the FDA instructed that manufacturers test at release and on stability (21 CFR 211.165, 211.166) and set an expiration date based on that data (21 CFR 211.137).[38]  Thus, FDA has concluded that any drug containing benzene in excess of 2 ppm is adulterated and should not be sold in the United States.

82.    Over the past three years alone, the FDA has announced over a dozen recalls of various drug and cosmetic products identified as containing "low" or "trace levels" of benzene, including certain hand sanitizers and aerosol drug products like sunscreens and antiperspirants.[39]

83.    The FDA's warnings are not unreasonable or unwarranted. As with other topically applied products, such as sunscreen, the application of BPO Products specifically increases dermal benzene absorption, thereby increasing the likelihood and severity of harm.[40]  Indeed, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[41]

---

[38] *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs*, FDA (last updated Feb. 24, 2025) https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[39] *See Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene*, FDA (July 14, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol; *Edgewell Personal Care Issues Voluntary Nationwide Recall of Banana Boat Hair & Scalp Sunscreen Due to the Presence of Benzene*, FDA (Jan. 30, 2023) https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/edgewell-personal-care-issues-voluntary-nationwide-recall-banana-boat-hair-scalp-sunscreen-due-0; P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene, FDA (Nov. 23, 2021) https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice#:~:text=The%20Procter%20%26%20Gamble%20Company%20(NYSE,level%20due%20to%20the%20presence.

[40] *Valisure Detects Benzene in Sunscreen*, Valisure (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/ (last visited June 12, 2025).

[41] *Benzene Chemical Fact Sheet*, supra note 23.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

84.    Thus, all of this guidance leads to only one conclusion, that benzene should not be present in OTC drugs unless absolutely unavoidable, and in those cases only under 2 ppm, due to the serious health risks.

## V.    DISCOVERY OF BENZENE IN THE BPO PRODUCTS AT DANGEROUS LEVELS EXCEEDING REGULATORY LIMITS

85.    On March 5, 2024, Valisure submitted a public citizens petition to the FDA requesting a recall and suspension of sales of benzoyl peroxide from the U.S. market. The petition was based on Valisure's findings that numerous BPO products contained elevated levels of benzene, a known human carcinogen.[42]

86.    "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238)," and it "is registered with the Drug Enforcement Administration (License # RV0484814)."[43] As an industry leader in independent chemical testing of medications, Valisure works with large private health care systems like Kaiser Permanente and governmental healthcare systems like the Military Health System through the U.S. Department of Defense.[44]

87.    In its citizens petition, Valisure reported its testing results for benzene in various types of BPO drug products, mostly utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion chromatograms, along with Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS") for detection of benzene released into the air around certain BPO products. Valisure also used other orthogonal approaches for confirmation of a few select products.[45]

---

[42] David Light et al, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Product*, Valisure at 28-29 (Mar. 5, 2024), https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf (hereinafter, *Valisure Citizen Petition*).
[43] *Id.*
[44] *Valisure Signs Agreement with Department of Defense to Independently Test & Quality Score Drugs,* PR Newswire (Aug. 8, 2023), https://www.prnewswire.com/newsreleases/valisure-signs-agreement-with-department-of-defense-to-independently-test--quality-score-drugs301895301.html.
[45] *Id.* at 10.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

88.    GC-MS "is generally considered one of the most accurate analyses available."[46] The FDA used the same method to test for impurities like benzene in hand sanitizers[47] and sunscreen products.[48]

89.    "The GC-MS method described in [Valisure's] petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[49]

90.    As reported, Valisure analyzed sixty-six different BPO containing drug products, both prescription and over-the-counter ("OTC") for the presence of benzene. Valisure acquired the products and incubated the products at 50°C[50] for 18 days, with samples measured at day 0, 4, 10, 14, and 18. These BPO containing products represented creams, lotions, gels, washes, liquids, and bars, and included analysis of Defendant's BPO cream.[51]

91.    Valisure's findings with respect to its benzene testing of the BPO Product has been published in peer-reviewed literature.[52]

92.    As noted in the chart below, testing conducted by Valisure on Defendant's PanOxyl® Acne Foaming Wash 10% BPO, in particular, revealed benzene levels over 170 ppm.[53]

---

[46] *See id.*; *see also GC/MS Analysis Services*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last accessed Jan. 4, 2026).
[47] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), available at https://www.fda.gov/media/141501/download.
[48] Laurenee L. Adeoshun et al, *Laboratory Information Bulletin # 4674, Identification and Quantitation of Benzene Impurity in Sunscreen Product by Headspace Gas Chromatography-Mass Spectrometry Detection (HSGC-MS)*, FDA, https://www.fda.gov/media/169772/download.
[49] *Valisure Citizen Petition*, *supra* note 42, at 10-11 (citations omitted).
[50] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." *Id.* at 18-19 (citations omitted).
[51] *Id.* at 16, 23.
[52] Kucera, *supra* note 14.
[53] *Valisure Citizen Petition*, *supra* note 42, at 16. The Universal Product Code ("UPC") for the test conducted on PanOxyl® Acne Foaming Wash 10% BPO is identified as 303160228551.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT



Figure 4A



Figure 4B



Figure 4C

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT







96.

97.

98.

99.

100.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT



Figure 4G



Figure 4H



Figure 4I

101.    Independent testing conducted on BPO Products purchased by Plaintiffs similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm, even though BPO Products are not designed to contain benzene.

102.    And despite its personal knowledge that BPO Products previously sold to consumers (including Plaintiffs) and currently in distribution contain over 2 ppm benzene, to date Defendant has failed to issue a voluntary recall. This is unconscionable, considering the binding 2 ppm federal requirements of the USP, the binding testing requirements under the cGMPs that are

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

required to ensure products meet their specifications for purity and quality, and FDA guidance providing that Class 1 solvents like benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity."[54] Nevertheless, Defendant continues to manufacture, market, and sell its adulterated and misbranded BPO Products for profit. This illustrates Defendant's wanton and reckless conduct, its callous disregard for the law, and its disregard for the health and safety of consumers who buy its BPO Products, justifying an award of punitive damages.

**VI.    DEFENDANT'S KNOWLEDGE, MISREPRESENTATIONS, OMISSIONS, AND CONCEALMENT OF MATERIAL FACTS DECEIVED PLAINTIFFS AND REASONABLE CONSUMERS**

103.    The chemical degradation of BPO into benzene is not a new phenomenon, nor did it begin with the Valisure Citizen Petition in March 2024. Rather, it is an inherent chemical property of the BPO molecule, and the risk that BPO may degrade into benzene has always existed.  Although steps can be taken to avoid BPO degradation into benzene, Defendant has never taken those steps and, instead, has knowingly sold BPO products contaminated with benzene that were adulterated and misbranded.

104.    It has been well known for decades that BPO can degrade to benzene, and that the likelihood of this degradation increases with exposure to heat over time—a process was first reported in scientific literature as early as 1936 and has been recognized and addressed in both the acne treatment industry and industries beyond BPO Products.[55] Despite this public information, Defendants have never conveyed this scientific information to the FDA and, thus, it is unlikely that the FDA has known about this issue until the public citizen petition filed by Valisure.

---

[54] *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene; Guidance for Industry – Final Guidance*, FDA (Dec. 27, 2023), https://www.regulations.gov/document/FDA-2023-D-5408-0002.

[55] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* 19 Helv. Chim. Acta 338 (1936).

105.    This degradation occurs because of a specific, well-understood chemical mechanism: BPO thermally decomposes to form two molecules of benzoyloxy radicals, which further decompose into phenyl radicals with the liberation of carbon dioxide. These phenyl radicals then produce benzene.[56]  This process is illustrated below.

Free radical and heat

Benzoyl peroxide → 2 Benzoic acid

Benzoic acid → Benzene · + $CO_2$

106.    This chemical degradation is not an accidental contamination or a manufacturing fluke. Rather, Defendant's BPO Product is a chemically unstable.  Although Valisure's citizen's petition provides some insight into way to stop BPO degradation, Defendants have never taken those steps to prevent benzene formation from BPO products.

107.    The issue of BPO decomposition into benzene has been previously identified in the acne treatment product industry, even if it has not been shared with the FDA.  In 1977, researchers set out to "evaluate the decomposition of benzoyl peroxide" in pharmaceutical gel preparations.[57]  The authors initially observed that, "[b]enzoyl peroxide pharmaceutical preparations are widely used in the treatment of acne. However, due to the inherent chemical nature of benzoyl peroxide, degradation of these preparations is often encountered in storage."[58] Citing to Erlenmeyer and Schoenauer's study from 1936 (referenced above), the authors noted that "when heated, benzoyl peroxide, either in pure form or in nonpolar solvents, decomposed to

[56] *See* Shang-Hao Liu et al., *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III*, 605 Thermochim. Acta 68 (2015).
[57] J.N. Bollinger, D. Lewis & V.M. Mendez, *Benzoyl Peroxide Stability in Pharmaceutical Gel Preparations*, 66 J. Pharm. Sci. 718 (1977).
[58] *Id*. at 718.

yield dioxide, biphenyl, phenyl benzoate, and *benzene.*"[59] Citing additional published literature from 1954, the authors further noted that "[i]n the presence of acetic acid, it decomposed to form carbon dioxide, benzoic acid, phenylbenzoic acid, *benzene*, and phthalic acids."[60]  The study found that "[a]t both 30 and 40°[61] storage temperatures, benzoyl peroxide was destroyed rapidly (within 1 month) in the presence of ethanol and acidic chelating agents."[62] The authors concluded that "the result of this investigation demonstrated that the stability of benzoyl peroxide in pharmaceutical gel preparation is strongly influenced by the chemical makeup of the formulations and, secondarily, by the storage temperature due to increased reactivity."[63]

108.    This known risk was so prevalent that manufacturers actively sought patents to mitigate the formation of benzene in consumer products.  In 2008, a patent application was filed to address the stability of organic peroxide compositions, including benzoyl peroxide when used as an active ingredient in pharmaceuticals.[64] The inventors observed BPO's chemical properties, noting that, first, "benzoyl peroxide free radicals can attack the cell walls of the bacteria thus destroying bacteria[, and s]econd, the decomposition of the benzoyl peroxide will result in forming benzoic acid, *benzene*, phenyl benzoate and biphenyls, all such materials can be toxic to cell."[65] The inventors thus noted that BPO's decomposition "must be controlled to allow use of solutions while providing sufficient storage life."[66]

109.    Similarly, in 1997, the chemical company Akzo Nobel N.V. filed a patent application for "a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes, emulsions, suspensions, dispersions and the like."[67]

---

[59] *Id*.
[60] *Id*. (citing M.T. Gladstone, J. Am. Chem. Soc., 76, 1581 (1954)) (emphasis added).
[61] 30° C is 86 F and 40° is 104 F.
[62] *Id*.
[63] *Id*. at 722.
[64] Faryniarz et al., U.S. Patent Application, Number 2009/005439 A1, filed June 23, 2008.
[65] *Id*. at 2 (emphasis added).
[66] *Id*.
[67] Borys F. Schafran & Bryce Milleville, *Reduction of Benzene Formation in Dibenzoyl Peroxide Formulations*, WO Patent 1997032845A1 (1997),
(footnote continued)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

110.    More recently, in 2016, a peer-reviewed study evaluated the excessive use of BPO in wheat flour. Researchers found that heating "BPO in wheat flour . . . decomposed into . . . deleterious substances, e.g., *benzene*."[68]

111.    Defendant markets itself as offering a "clinically-proven, dermatologist-recommended"[69] line of acne treatment products with "high-quality, scientifically proven ingredients"[70] that are "[a]lways backed by science."[71] Defendant expends substantial sums of money and resources on science and research, employing high-level scientists, chemists, and researchers to decide which drug products it will sell. Because, as a matter of law, drug manufacturers such as Defendant are held to the skill of an expert in the field, they must keep abreast of scientific advances. A reasonably prudent manufacturer is deemed to know of reliable information generally available or reasonably obtainable in the industry or in the particular field involved.

112.    As such, Defendant was aware of the established chemical processes that cause its BPO Products to contain benzene and/or degrade to form benzene when exposed to commonly used temperatures and conditions.  Because the scientific community was aware, even if the FDA was not, that BPO degrades into benzene to form benzene when exposed to commonly used temperatures and conditions for nearly 90 years, it is plausible to infer that Defendant—who is held to the standard of a reasonable manufacturer expert—was also aware of this risk at the time the FDA initially approved BPO as GRAS/E in 2010, thus giving rise to a duty test BPO products for benzene. *See Howard v. Alchemee, LLC*, 2024 WL 4272931, at *7 (C.D. Cal. Sept. 19, 2024)

https://patents.google.com/patent/WO1997032845A1/en.

[68] Guo X., et al. *Rapid Determination and Chemical Change Tracking of Benzoyl Peroxide in Wheat Flour by Multi-Step IR Macro-Fingerprinting*, 154 Spectrochim. Acta, Part A. 123 (2016) (emphasis added).

[69] *PanOxyl Named #1 Dermatologist Recommended Benzoyl Peroxide Brand*, Crown Lab., Inc. (Oct. 24, 2022), https://www.crownlaboratories.com/news/panoxyl-named-1-dermatologist-recommended-benzoyl-peroxide-brand/#:~:text=There%20is%20no%20doubt%20that,reveal%20your%20best%2Dlooking%20skin.

[70] *PanOxyl Acne Creamy Wash Daily Control*, PanOxyl, https://panoxyl.com/acne-products/acne-creamy-wash/ (last visited Jan. 15, 2026).

[71] *Panoxyl*, *supra* note 69.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(if the scientific community has known for almost 90 years that BPO can degrade into benzene, it is implausible to suggest "the FDA—a federal agency that depends on its 'scientific expertise' to regulate drug safety—was ignorant of a chemical process commonly known among scientists.").

113. Defendant knew or should have known that certain ingredients—specifically carbomers and other petroleum-derived substances—are recognized "red flags" for benzene contamination.[72] Because the BPO Products contain these hydrocarbon-derived ingredients, it was reasonably foreseeable that they could yield benzene.

114. Indeed, Defendant's manufacturer and use of BPO itself put it on notice of the excessive levels of benzene (i.e. defects) in the BPO Products.

115. Not only was the risk of benzene formation from BPO well established in the scientific literature and recognized across multiple industries, but by the time Defendant marketed and sold the BPO Products, benzene contamination had already become a recognized problem in consumer drug and healthcare products, prompting recalls, regulatory scrutiny, and direct FDA warnings to BPO-containing drug manufacturers, explicitly stating that Defendant had a duty to test for benzene.

116. Beginning in 2020, the FDA worked with manufacturers to identify benzene contamination, resulting in recalls of hand sanitizers, sunscreens, and deodorants. In 2021, independent testing by Valisure of hundreds of sunscreen and after-sun products from 69 brands found that 27 percent of tested batches contained benzene above the FDA's 2 ppm limit. This led to mass recalls of products sold by major retailers, including Johnson & Johnson's Aveeno and Neutrogena sunscreen lines and CVS private-label after-sun products. Defendant was well aware of these benzene contamination issues affecting comparable OTC drug products, yet Defendant ignored these reports and continued selling BPO Products without testing for benzene.

117. On December 23, 2021, the FDA issued a statement alerting manufacturers to the risk of benzene contamination, "*Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains*

---

[72] *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, supra note 38.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

benzene at or above 2 ppm, consistent with the recommendations described in ICH Q3C."[73] The warning continued: "remind[ing] drug manufacturers they are *required* to establish … *test procedures* to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate qualify specifications (21 CFR 211.84, 21 CFR 211.160). This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity."[74] The FDA further stated, "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" The FDA's alert urged drug manufacturers using hydrocarbon-derived ingredients, including carbomers (thickening agents), to test products for benzene contamination.[75]

118.    To date, none of Defendant's BPO Products have been recalled due to benzene contamination. The findings from Plaintiff Gerena's personal products (five Panoxyl products ranging from 733.38 pm to 849.63 ppm benzene) and Valisure's stability testing prove that the benzene detected in Defendant's BPO Products is not a trace impurity, but a massive chemical breakdown of the product's active ingredient caused by Defendant's defective formulation and failure to conduct stability testing sufficient to detect benzene formation during the product's shelf life.

119.    Had Defendant adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

---

[73] Food and Drug Administration, News Release, "FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs," December 23, 2021, ("FDA Alert") available at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.
[74] *Id.*
[75] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

120.    Defendant sold, and continues to sell, BPO Products during the class period despite its knowledge that its Products contain benzene and/or degrade to form benzene at levels which exceed FDA guidelines and pose a threat of serious adverse effects on consumers.

121.    Defendant has engaged in deceptive, untrue, and misleading advertising by failing to warn about the presence of benzene in its BPO Products.

122.    Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced the contaminated, adulterated, and misbranded BPO Products into the U.S. market.

## VII.    BENZENE RENDERS THE BPO PRODUCT ADULTERATED, MISBRANDED, AND ILLEGAL TO SELL

123.    The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with the FDCA's applicable monograph, current good manufacturing practices, and must conform to quality, safety, and purity specifications under relevant USP provisions.

124.    While most drugs must be approved for sale individually, the monograph system allows manufacturers to bypass individualized review.[76] Using administrative orders, the FDA issues a monograph for a therapeutic class of over-the-counter drug products, which provide the conditions necessary for the drug to be considered generally safe and effective ("GRASE").[77] "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b).

125.    Acne medications containing BPO are regulated under the FDA's monograph for over-the-counter acne drug products ("Acne Monograph"), codified at 21 C.F.R. § 333.301 *et seq.*

---

[76] *See* 21 U.S.C. § 355h; 21 C.F.R. § 330.10.
[77] *Id.*

126.    The Acne Monograph states that a BPO product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart and each general condition established in § 330.1 of this chapter."[78]

127.    Section 330.1, in turn, requires all products subject to a monograph to be "in compliance with chapter V of the [FDCA,]" which prohibits the sale of adulterated or misbranded drugs.[79]

128.    A drug is misbranded if the label is "false or misleading in any particular."[80] This includes failing "to reveal facts material . . . which may result from the use of the article under such conditions of use as are customary or usual," or including a component "dangerous to health under the conditions of use prescribed in the labeling or advertising thereof."[81]

129.    Under 21 U.S.C. § 351(a), a drug may adulterated under federal and applicable state laws if, "it consists in whole or in part of any filthy, putrid, or decomposed substance"[82]; "it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health"[83]; or "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or

---

[78] *See* 21 C.F.R. § 333.301(a).
[79] 21 C.F.R. § 330.1(c)(1); 21 U.S.C.§§ 351, 352.
[80] 21 U.S.C. § 352(a)(1); Cal. Health & Safety Code § 111330; LSA-R.S. 40:617(1); R.C.N.Y. Health Code § 71.05(f)(1); Mo. Rev. Stat. § 196.100(1) (adopting labeling requirements contained in FDCA and any regulations promulgated thereunder); *see also* Mo. Rev. Stat. § 196.101(2) (drug may be misbranded if its "labeling is misleading"); N.Y. Gen. Bus. § 350, *et seq.* ("False advertising in the conduct of any business, trade or commerce…in this state is hereby declared unlawful"); N.Y. Gen. Bus. § 349, et seq ("Deceptive acts or practices in the conduct of any business, trade or commerce … in this state are hereby declared unlawful").
[81] 21 U.S.C. § 352(j); Cal. Health & Safety Code § 111400; Mo. Rev. Stat. § 196.100 (adopting FDCA labeling requirements); LSA-R.S. 40:617(2); Mo. Rev. Stat. § 196.015(5) ("the manufacturer, distributor or seller engages in "[t]he dissemination of any false advertisement"); Cal. Health & Safety Code § 110390; LSA-R.S. 40:625; *see also* Cal. Health & Safety Code § 110395 (unlawful for any person to manufacture, sell, deliver or offer for sale any drug that is falsely advertised); N.Y. Gen. Bus. § 350, *et seq.* ("False advertising in the conduct of any business, trade or commerce…in this state is hereby declared unlawful").
[82] 21 U.S.C. § 351(a)(1); Mo. Rev. Stat. § 196.095(1); LSA-R.S. 40:616(1); Cal. Health & Safety Code § 111250; 24 R.C.N.Y. Health Code § 71.05(e)(3).
"[83] 21 U.S.C. § 351(a)(1); Cal. Health & Safety Code § 111255; Mo. Rev. Stat. § 196.095(1); LSA-R.S. 40:616(2); R.C.N.Y. Health Code § 71.05(e)(4). *See also* Mo. Rev. Stat. § 196.010 (the term "contaminated with filth" applies to any drug not reasonably protected from "injurious contaminations").

44
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

holding do not conform to or are not operated or administered in conformity with ***current good manufacturing practice*** to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[84]

130.    In addition, pursuant to 21 U.S.C. § 351(b) (Section 501(b) of the FDCA incorporating USP General Chapter 467), a drug is legally deemed adulterated if it is recognized in an "official compendium" and its quality or purity falls below the standards set forth in that compendium.[85] Under 21 U.S.C. § 321(j), the term "official compendium" includes the United States Pharmacopeia and incorporates USP standards by reference, effectively turning these scientific standards into federal law.

131.    Relevant to this case, this means Defendant is not only bound by the general safety provisions in 351(a)(1), but Defendant is also bound by the USP binding regulations under 351(b). These regulations strictly prohibit benzene in excess of 2 ppm and require specific testing to ensure compliance. Here, Plaintiffs allege that Defendant not only failed to conduct the requisite USP testing but also released BPO products into the stream of commerce containing benzene levels far exceeding the 2 ppm limit.

132.    Furthermore, independent of the final benzene concentration, the cGMP binding regulations require manufacturers to implement process controls, purity and stability testing, and rejection of contaminated batches to ensure the drug product remains safe and pure throughout its shelf life. Here, Plaintiffs allege that Defendant's failure to test for benzene formation during stability studies constitutes a per se failure to conform to cGMPs, rendering the products adulterated as a matter of law regardless of the ultimate test results.

133.    Although they are different theories of adulteration, these provisions in Sections 351(a) and (b) often work hand-in-hand. When a drug is manufactured, stored, or distributed in violation of applicable standards, including the Current Good Manufacturing Practices, such

---

[84] 21 U.S.C. § 351(a)(2).
[85] 21 U.S.C. § 351(b); Mo. Rev. Stat. § 196.095(6); Cal. Health & Safety Code § 111280; Cal. Health & Safety Code § 111285; LSA-R.S. 40:616(6); R.C.N.Y. Health Code § 71.05(e)(7), (8) .

violations can result in chemical decomposition or loss of purity under § 351(a), rendering the product potentially injurious to health. That same loss of purity may also cause the drug to fail to meet binding quality and purity standards established by the USP Chapter <467>, rendering the product independently adulterated under § 351(b).

134.    For example, although benzene is best avoided altogether, as explained above, the FDA sets a hard limit of 2 ppm through incorporation of USP <467>.[86] Under 21 CFR 211.160 and 211.165, manufacturers must use "scientifically sound and appropriate specifications" and "test procedures" to ensure drug products conform to standards of purity, including the 2 ppm limit, and USP <467> mandates that drug manufacturers, including BPO Products manufacturers, conduct specific types of testing for benzene contamination and product purity.[87]

135.    Thus, the Acne Monograph expressly incorporates the general misbranding and adulteration requirements under 21 U.S.C. §§ 351 and 352.  Further, Section 351 mandates compliance with the cGMPs and "official compendiums," such as those published by the USP.[88]

136.    Because the Monograph conditions a product's "generally recognized as safe and effective" status on compliance with the adulteration and misbranding provisions of the FDCA, a drug manufactured in violation of the Section 351 or 352 provisions, the cGMPs, or the applicable USP provisions is, by definition, a drug that failed to comply with the Monograph itself.

A.    **Adulterated Drugs Are Illegal to Sell**

137.    Defendant's BPO Products are adulterated under 21 U.S.C. § 351 by the presence of benzene in Defendants' BPO products because: (1) benzene is a decomposed or filthy substance found in Defendants' BPO products pursuant to §351(a)(1); (2) benzene's presence in Defendants' BPO resulted from inadequate methods, facilities, testing, and/or controls in

[86] *USP 467*, supra note 1, at 2; *Q3C Tables*, supra note 29, at 5.
[87] 21 C.F.R. § 211.160, 211.165; *USP 467*, supra note 1, at 2 ("Testing of drug substances, excipients, and drug products for residual solvents should be performed when production or purification processes are known to result in the presence of such residual solvents.")
[88] "The term 'official compendium' means the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United States, official National Formulary, or any supplement to any of them." 21 U.S.C. § 321(j).

violation of current good manufacturing practice under §351(a)(2)(B); and (3) Defendant did not ensure its BPO Products met the purity standards (2 ppm benzene) under USP General Chapter 467 as incorporated by 21 U.S.C. § 351(b), rendering the products adulterated.

### (i)    Adulterated Under 351(a)(1)-(2) by the Presence of Benzene

138.    The presence of benzene in the BPO Products renders the Products adulterated and, thus, illegal to sell. As such, the BPO Products have no economic value and are worthless. This the same prohibition of the sale of worthless drugs imposed by state consumer protection laws. Worse, as manufactured, the levels of benzene contained in the BPO Products are dangerous to health under the conditions of use prescribed in the labeling and advertising.

139.    Independent testing conducted by Valisure and Plaintiffs' counsel demonstrates that Defendant's BPO Products contained benzene levels ranging from 1.8 ppm to over 2,000 ppm, far exceeding the FDA's 2 ppm limit for unavoidable residual solvents. The formation of benzene reflects chemical decomposition of the BPO Products, meaning the Products consist, in part, of a decomposed and unsafe substance, rendering them adulterated under federal law.

140.    The BPO Products sold by Defendant systematically degrade to form benzene when exposed to normal and expected handling, storage, and use, including elevated temperatures encountered during shipping, in vehicles, bathrooms, and during application to the skin. Because benzene is a known human carcinogen and is not an intended component of the BPO Products, its presence constitutes a decomposed substance under 21 U.S.C. § 351(a)(1).

141.    Defendant knew, or should have known, through industry research, scientific literature, and stability studies, that BPO-containing formulations degrade into benzene, yet continued to market and sell the Products without adequate testing or rejection of affected batches. By distributing Products containing benzene, Defendant introduced drugs that contain a decomposed, unsafe substance into commerce, in direct violation of Section 351(a)(1).

### (ii)    Adulterated as a Result of cGMP Violations

142.    Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" and may not be distributed or sold in the United States. *See* 21 §§ 330.1,

351(a)(2)(B), 210.1(b). States have enacted laws adopting or mirroring these federal standards. *See* Section VII, *supra*.

143.    The cGMPs are the "minimum [requirements] for methods to be used in, and the facilities or controls to be use for, the manufacture, processing, packaging, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and … meets the quality and purity characteristics that it purports or is represented to possess." 21 CFR § 210.1(a).

144.    As discussed above, benzene is a "Class 1 residual solvent," a specific subclassification of "impurities"[89] manufacturers are required to monitor and control.[90] Indeed, the FDA explicitly ties the removal of residual solvents to cGMP compliance, stating that "all residual solvents should be removed to the extent possible to meet . . . good manufacturing practices."[91]

145.    Benzene specifically is restricted by the FDA, through incorporation of USP chapter <467>, to 2 ppm where its use in manufacturing "is unavoidable in order to produce a drug product with a significant therapeutic advance."[92] Except in such "limited cases," Class 1 solvents such as benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity."[93] Defendant's BPO Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the BPO Products is not "unavoidable," nor does the use of benzene in BPO Products provide a "significant therapeutic advance."

---

[89] Unlike ingredients, which are purposely added, impurities may "arise during the synthesis, purification, and storage of a new drug substance." *Sandoz Inc. v. Becerra*, 57 F.4th 272, 283 (D.C. Cir. 2023); *see Guidance for Industry: Q3A Impurities in New Drug Substances*, FDA at 9 (June 2008), https://www.fda.gov/media/71727/download ("Impurity: Any component of the new drug substance that is not the chemical entity defined as the new drug substance"; "Potential Impurity: An impurity that theoretically can arise during manufacture or storage. It may or may not actually appear in the new drug substance.").
[90] *See Q3C Tables*, supra note 29, at 2.
[91] *Q3C(R8) Impurities: Guidance for Residual Solvents*, FDA at 2 (Dec. 2021), https://www.fda.gov/media/138334/download.
[92] *USP 467*, supra note 1, at 2; *Q3C Tables*, supra note 29, at 5.
[93] Q3C, *supra*, note 91, at 2.

146.    The presence of benzene in Defendant's BPO Products is not inherent or unavoidable, but rather the direct result of Defendant's failure to comply with the bare "minimum," the cGMPs, which are designed to ensure drug purity, stability, and consumer safety.

147.    Defendant could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.[94] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments.[95] Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed.[96]

148.    This is supported by the FDA's July 2021 Health Hazard Evaluation, which concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function," were "likely to occur" at exposure levels of between 11.2 to 23.6 ppm benzene.[97] Defendant's BPO Products, as tested by Valisure and by Plaintiffs in this case, contain benzene above these "life-threatening" levels.

149.    Further, as manufacturers, distributors, and sellers of acne treatment products, Defendant had and has a duty to ensure that its BPO Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the BPO Products into the stream of commerce for consumers to use on their skin.[98] This includes testing of raw materials and finished product batches prior to release to ensure they meet

---

[94] *Valisure Citizens Petition* at 25 (citation omitted).
[95] *Id.*
[96] *See id.* at 25-26.
[97] *CDER Health Hazard Evaluation*, CDER (Apr. 6, 2020), https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.
[98] 21 CFR §§ 211.84, 211.160.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

appropriate specifications for identity, strength, quality, and purity.[99] But Defendant made no reasonable effort to test its BPO Products for the presence of benzene or test whether the Products could degrade into benzene over the course of the shelf-life of the Products.

150.    Defendant's BPO Products did not conform to its final monograph specifications after its effective date, which demonstrates inadequate production, process, and quality oversight by Defendant. 21 C.F.R. § 330.10(b).

151.    Thus, Defendant has violated numerous cGMPs in its manufacture of BPO Products, including:

a.    **Failure to Establish Scientifically Sound Specifications (21 C.F.R. §§ 211.160, 211.87, 21 C.F.R. § 211.100).**

Defendant was required to establish and/or follow "test procedures, or other laboratory control mechanisms" to "assure that components"[100] (including the active ingredient, raw BPO), in-process materials, labeling, and drug products conform to appropriate standards of identity, quality, and purity." However, Defendant failed to assure component purity for BPO via mandated testing and retesting procedures to assess BPO degradation.[101]  Because raw BPO is stable up to 98°C, Defendant did not establish specifications for raw BPO and did not conduct retesting of BPO as required, which is known to be "subject to deterioration" into benzene due to heat exposure during shipping or storage, to ensure they were free from benzene precursors or existing contamination.

Moreover, Defendant failed to establish necessary purity specifications for the known degradant, benzene.[102]  Because it has been known since at least 1936 that the BPO molecule is thermally unstable and degrades into benzene, Defendant had been repeatedly warned by the FDA, and it is required on the FDCA's

---

[99] 21 CFR § 211.165.
[100] "Component means any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." 21 C.F.R. § 210.3(3).
[101] 21 C.F.R. § 211.160(b)(1).
[102] 21 C.F.R. § 211.160(b).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

incorporation of USP <467> standards, Defendant's specifications must include a maximum threshold for benzene formation (2 ppm)—the limit set by the FDA that manufacturers must adopt. Defendant chose not to have any such purity standard for benzene, choosing instead to ignore a known chemical pathway with a mandatory cap in favor of cheaper, less rigorous testing protocols.

This failure fundamentally violates the requirement to establish laboratory control mechanisms to assure drug products conform to standards of identity and purity (21 C.F.R. § 211.160(a)-(b), 21 C.F.R. § 211.100) and to retest components subject to deterioration (21 C.F.R. § 211.87).

b. **Failure to Utilize "Meaningful and Specific" Stability Test Methods (21 C.F.R. § 211.166).**

Federal regulations require drug manufacturers to maintain a written stability testing program using "reliable, meaningful, and specific test methods." Defendant's stability testing program omitted testing for benzene and therefore failed to evaluate a known and well-documented degradation pathway of the active ingredient. A stability program that excludes assessment of a purity attribute subject to an established numerical limit is incapable of providing meaningful or specific information regarding product stability and does not satisfy the requirements of 21 C.F.R. § 211.166. By omitting benzene from its stability program, Defendant violated the mandate for "reliable, meaningful, and specific test methods" (21 C.F.R. § 211.166).

c. **Failure to Test Components, Investigate Unexplained Discrepancies, and Reject Adulterated Lots (§§ 211.84(d), 211.165, 211.192, 211.67, 211.100, 211.110):**

The cGMPs establish a mandatory "gatekeeper" process to ensure that adulterated drugs never reach consumers. The cGMPs require that each batch be tested prior to release and that any batch showing an unexplained discrepancy or failure to meet specifications be rejected. But, Defendant skipped these mandated

51

tests for the specific batches purchased by Plaintiffs, and illegally released the contaminated batches anyway.

First, federal law mandates that for each batch of drug product, there "shall be appropriate laboratory determination of satisfactory conformance to final specifications" prior to release (§ 211.165(a)). By failing to establish adequate acceptance criteria, control procedures to validate performance of manufacturing processes, or conduct testing for benzene—a known degradant— before release, Defendant could not "assure that batches of drug products meet each appropriate specification" required for approval and release (§ 211.165(d), § 211.110, § 211.100).

Second, the Quality Control Unit ("QCU") has an affirmative duty to "thoroughly investigate" any "unexplained discrepancy" or failure of a batch to meet specifications, "whether or not the batch has already been distributed." Because the instability of BPO and its degradation into benzene is a scientifically documented "discrepancy," the QCU's failure to review production records or investigate this degradation pathway constitutes a systemic failure to determine compliance with established procedures (§ 211.192).

Finally, Defendant was required (1) to test or examine sample lots of components—such as active ingredients like BPO—for conformity with all written specifications for purity, strength, and quality before release or sale for use; and (2) to reject sample lots of components that did not meet the written specifications for identity, quality and purity and related tests (§ 211.84). Defendant failed to test its active ingredient BPO for the presence of benzene in violation of the affirmative testing duties mandated by cGMPs and USP <467>. Defendant adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

d. **Failure to Maintain Facilities and Temperature Controls (21 C.F.R. §§ 211.142).**

cGMPs require the "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products is not affected," as required by 21 CFR § 211.142(b). The instability in Defendant's BPO products arises due to, in part, improper manufacturing or holding conditions (e.g., improperly refrigerated shipping or warehouse storage). Upon information and belief, Defendant violated the cGMPs by shipping and holding BPO Products in inadequately refrigerated environments, effectively catalyzing the formation of benzene before the product reached Plaintiffs.

While Defendant purports to comply with the standards set forth in USP <1079> and the cGMPs. However, Defendant's own lack of stability testing makes compliance with USP <1079> a physical and legal impossibility.[103] USP <1079> states that environmental controls are "key" to maintaining drug safety and quality, and that "[t]emperature is one of the most important parameters to control."[104] USP <1079> explicitly states that "drugs must be stored and transported according to predetermined conditions (e.g., temperature) **as supported by stability data.**"[105] While USP <1079> allows for brief "temperature excursions" outside of labeled storage conditions, such excursions are only acceptable **"provided that stability data and scientific/technical justification exist"** to prove that product safety and quality are not affected.

Because Defendant has admitted it did not conduct stability testing for benzene formation prior to 2024, it possesses no "stability data" or

---

[103] *See* Ex. 3, Crown's Resp. to Interrogatories, at 18.
[104] *USP <1079>,* https://www.usp.org/sites/default/files/usp/document/supply-chain/apec-toolkit/USP%20GC1079.pdf.
[105] *Id.*

"scientific/technical justification" to excuse the temperature spikes its products experienced during shipping and storage.[106]

Consequently, any temperature excursion—no matter how brief—rendered the BPO Products adulterated because Defendant had no data to ensure that such heat exposure would not trigger the degradation of BPO into benzene. By shipping these products without the refrigerated controls required for a thermally unstable molecule, and without the stability data required by USP <1079> to justify that failure, Defendant directly violated 21 C.F.R. § 211.142.

e. **Expiration Dates Not Supported by Stability Data (21 CFR § 211.137).**

Defendant is required under cGMPs to ensure that its products meet standards of purity at the time of consumer use, which in turn requires assigning an expiration date supported by stability data. Stability testing must evaluate whether the drug product remains safe and pure throughout its shelf life under all expected distributor and consumer storage, handling, and use conditions, using "reliable, meaningful, and specific" test methods.[107]

It is well known that chemical ingredients may degrade over time or in response to environmental factors such as temperature, light, moisture, and humidity, and any stability testing demonstrating degradation or formation of toxic byproducts renders the product unfit for sale. This requires an expiration date related to the specific storage conditions on the label.

Defendant's 2-to-3-year expiration dates are legally invalid because they are not supported by stability testing data showing that the BPO Products remain below 2 ppm benzene when stored over that time period. By omitting benzene from its stability program, Defendant violated the mandate for "reliable,

---

[106] *Id.*
[107] 21 CFR § 211.166.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

meaningful, and specific test methods" (21 C.F.R. § 211.166) and the requirement that expiration dates be supported by such data (21 C.F.R. § 211.137).

152. Past FDA regulatory action demonstrates that these types of violations are of the type to render products adulterated and thus illegal to sell. For example, in 2022, the FDA sent a "warning letter" to a company that manufactured hand sanitizers found to be contaminated with "approximately 12 ppm benzene," which the agency alleged "demonstrate that the drug product contained impurities at unacceptable levels." This level of benzene contamination prompted the agency to "recommend [the company] consider removing the adulterated batches … currently in distribution from the U.S. market." The agency alleged that, because benzene contamination is a known risk of the manufacturing process, the company's failure to test its product for benzene was a violation of cGMPs.  Specifically, the FDA alleged the company

> failed to conduct impurity testing, including … [for] benzene, of active pharmaceutical ingredients or your finished … drug products prior to distribution. Because these impurities are a known risk of the manufacturing process, a *finished product specification for these impurities in [the company's products] is appropriate* under [cGMP] 21 CFR 211.160(b). Further, *finished product testing of each batch of drug product is required under [cGMP] 21 CFR 211.165.*

> *The contamination with benzene* … in drug products manufactured in your facility, in addition to your failure to conduct impurity testing of your drug products prior to distribution, *demonstrate that the quality assurance within your facility is not functioning in accordance with CGMP requirements* under section 501(a)(2)(B) of the FD&C Act.[108]

153. Similarly, in October 2025, the FDA sent a "warning letter" to Owen Biosciences, Inc. stating that the agency had "sampled and tested one lot" of the company's benzoyl peroxide acne treatment product which revealed the product "contained excessive benzene impurity levels of more than 20 ppm."[109] The FDA alleged this level of benzene contamination rendered the product "adulterated" and "recommend[ed] removal of this product lot from the U.S. market[.]" Owen responded that it was "not aware of any FDA guideline on benzene testing." Citing the

---

[108] *Warning Letter Salon Technologies International, Inc.*, FDA (Dec. 21, 2022), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/salon-technologies-international-inc-630566-12212022.
[109] Ex. 1, FDA Letter to Owen Biosciences, Inc.

FDA alert, first published in December 2021, the agency rejected that assertion, stating "FDA has alerted drug manufacturers of products at risk for presence of benzene that they should be testing those drug products for benzene."

154. In short, the cGMPs *require* that "drug manufacturers with a risk for benzene contamination" test their drugs for benzene. As alleged, there is a risk for benzene contamination in the manufacturing of benzoyl peroxide, a scientific fact that has been known for decades.

155. Nevertheless, in its sworn discovery responses, Defendant "admits that, prior to 2024, Crown did not test its [BPO] Products for benzene."[110]

156. Defendant sold, and continues to sell, BPO Products during the class period despite its knowledge that its Products were made in violation of the cGMPs, rendering the BPO Products adulterated and posing a threat of serious adverse effects on consumers.

157. Defendant's failure to conform to cGMPs resulted in the production, and ultimate sale to consumers, of BPO Products that were so highly contaminated and/or adulterated with benzene that they could not be legally sold in the United States, yet Defendant still falsely labeled and marketed its illegal Products as compliant with state and FDCA drug regulations. That Defendant's BPO Products were able to reach the U.S. market with such high levels of benzene indicates that there was a critical failure in Defendant's quality control and testing protocols as required by the above-referenced cGMPs as incorporated into state law.

### (iii)    Adulterated Under 351(b) by Exceeding the 2 PPM Limit

158. The BPO Products are further adulterated under 21 U.S.C. § 351(b) because their purity falls below the official standards set forth in the USP.

159. Pursuant to 21 U.S.C. § 351(b) (Section 501(b) of the FDCA), a drug is legally deemed adulterated if it is recognized in an "official compendium" and its quality or purity falls below the standards set forth in that compendium. The Act further mandates that any determination of a drug's purity "shall be made in accordance with the tests or methods of assay set forth in such compendium." Under 21 U.S.C. § 321(j), the term "official compendium" is

---

[110] Ex. 2, Crown's Resp. to Requests for Admission, at 13.

defined to include the official United States Pharmacopoeia and the National Formulary. The Federal Food, Drug, and Cosmetic Act (FDCA) incorporates the standards of the United States Pharmacopeia (USP) by reference, effectively turning these scientific standards into federal law

160.    Defendant's BPO Products are definitively subject to the USP compendium, which includes specific monographs for hydrous benzoyl peroxide, benzoyl peroxide lotion, and benzoyl peroxide gel.[111] Regardless, USP General Notice 5.60.20 mandates that all USP articles are subject to the requirements of Chapter <467> "even when no test is specified in the individual monograph."[112]

161.    USP Chapter <467> is not limited to solvents added as ingredients; it explicitly defines residual solvents as organic volatile chemicals that are "used *or produced*" in the manufacture of drug substances or in the preparation of drug products.[113] Defendant's BPO Products are adulterated because they contain benzene—a degradant of the active ingredient BPO—that is *produced* as a byproduct during the manufacturing, processing, or holding of the drug. Thus, the toxicity and residual level of this produced benzene must be limited according to the 2 ppm threshold defined in Chapter <467>.

162.    Because Defendant's BPO Products contain benzene well in excess of this limit, they fail the mandatory purity standards of the official compendium, rendering them per se adulterated under Section 351(b).

163.    Defendant's failure to conduct the specific validated testing required by USP <467>, which ***explicitly requires Defendant to test for benzene,***[114] while continuing to represent the products as "USP" grade constitutes a direct violation of federal and parallel state law.

164.    Defendants were well aware of the USP's role as an official compendium incorporated into federal law and, in fact, selectively complied with multiple USP requirements applicable to their benzoyl peroxide products, including microbiological and quality-control

---

[111] USP Monographs, *supra* note 32.
[112] *General Notice 5.60.20*, *supra* note 31.
[113] *USP 467*, supra note 1, at 1.
[114] *USP 467*, *supra* note 1, at 1-2

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

standards such as USP <61>, <62>, and <60>.[115]  Defendants' adherence to these USP chapters demonstrates both their knowledge of USP requirements and their technical ability to implement USP-mandated testing and specifications.   Despite this awareness and capability, Defendants failed to comply with USP <467>, which establishes a specific, binding limit for benzene contamination and mandates appropriate testing for residual solvents. This selective noncompliance allowed benzene to remain undetected and unaddressed in Defendants' benzoyl peroxide products, resulting in products that fell below required standards of quality and purity and were adulterated under federal and state law.

**B.    Misbranded Drugs Are Illegal to Sell**

165.    Defendant's BPO Products are misbranded under 21 U.S.C. § 352 because the labeling is false, misleading, and incomplete. The Product labels, packaging, and advertising affirm the Products are safe and effective yet fail to disclose the presence of benzene or the risk of benzene formation. Accordingly, the BPO Products are misbranded under 21 U.S.C. § 352 and illegal to sell.

166.    As a threshold note, Drug manufacturers bear responsibility for the content of their labels at all times.

167.    Defendant failed to disclose that BPO is an inherently unstable molecule that decomposes into benzene—a known human carcinogen—under ordinary storage conditions and well within the product's expected shelf life.  Benzene is not listed on the BPO Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products.

168.    The following images provide an example of the labels for the three BPO Products at issue:

---

[115] Ex. 3, Crown's Resp. to Interrogatories, at 8.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT



9.                                    0.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1.

2.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

3.                                                    4.



175.    This omission occurred on the physical front and back labels of the BPO Products, marketing materials and on the product descriptions on Defendant's website. Nor did Defendant disclose to Plaintiffs in any advertising or marketing that its BPO Products contained or would degrade into benzene. To the contrary, Defendant represented the BPO Products were of merchantable quality, safe to use as prescribed, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

176.    Defendant's BPO Products degrade to benzene under normal and expected handling, use, or storage, including the common and foreseeable storage of acne treatments in bathrooms where the products are frequently exposed to elevated temperatures and humidity from hot showers. Defendant did not warn the public about the risk of benzene contamination or the health risks of exposure. Defendant never disclosed benzene, or that the Product was at risk of degradation, on any of its Products, labels, containers, websites or packaging. This marketing was and continues to be misleading, fraudulent, and dangerous.

177. By marketing it as a safe "treatment," Defendant created the misleading impression that the product was chemically stable. Plaintiffs read the label and, because the label failed to mention benzene or the risk of degradation, Plaintiffs reasonably believed the product was safe for its intended use. Plaintiffs would not have purchased the BPO Products had they been truthfully and accurately labeled.

178. Defendant has engaged in deceptive, untrue, and misleading advertising by failing to warn about the presence of benzene in its BPO Products.

179. Because the presence of benzene is dangerous and not disclosed, and because the product is marketed as safe and generally recognized as effective under the Acne Monograph, the BPO Products are misbranded.

180. Defendant did not merely provide the language required by the FDA's Acne Monograph; rather, it voluntarily made additional affirmative representations that were false and misleading.[116]

181. These representations included broad claims on its website asserting that its products, including BPO Products, were safe and that the company prioritized consumer and environmental well-being, leading consumers to reasonably believe it would not sell products contaminated with benzene. Defendant also made multiple additional misleading statements on the product packaging and labels that were not required by the Acne Monograph.

182. Beneath the Drug Facts, the label states "#1 Dermatologist Recommended Benzoyl Peroxide Brand," implying the Product is safe, effective, and high quality and building credibility in its brand. Similarly, on its website, Defendant markets itself as "The Acne Authority."[117]

183. These statements that the Product is "Dermatologist Recommended" is contrary to medical and scientific evidence and harms consumers by promoting purchase of an adulterated Product at risk of hazardous degradation. By including an endorsement not required by the Acne

---

[116] Under Ninth Circuit precedent, including *Hawkins v. Kroger Co.*, 906 F.3d 763 (9th Cir. 2018) and *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015), these voluntary statements are not preempted by the FDCA because they are not required by federal law.

[117] *About PanOxyl*, PanOxyl, https://panoxyl.com/about-panoxyl/ (last accessed Jan. 9, 2026).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Monograph, Defendant conveys to reasonable consumers that they can trust Defendant and that the BPO Products were vetted for safety by healthcare professionals, creating the false impression that dermatologists have evaluated the Products for the absence of carcinogens and misleading consumers into believing the Products are safe, stable, and free from dangerous impurities.

184.    The misbranding pays off. Defendant has been manufacturing BPO products for over fifty years, and serving millions of customers and patients every day both nationally and internationally.[118] Defendant produces the number-one best-selling acne face wash in the United States, reaping in immense revenue as a result.[119]

185.    By labeling and selling these items as "Benzoyl Peroxide" products, Defendant represents them as drugs recognized in the USP. Under 21 U.S.C. § 352(g), a drug is misbranded if it purports to be recognized in an official compendium but fails to conform to the standards of strength, quality, or purity prescribed therein. Because the Products fail the benzene limits and testing protocols established in USP <467>, they are misbranded as a matter of law.

186.    Defendant engaged in deceptive, untrue, and misleading conduct by advertising the BPO Products as safe and legal over-the-counter drugs while failing to warn consumers of the presence and risk of benzene contamination. Reasonable consumers, relying on Defendant's statements, reasonably believed the BPO Products were safe and free of carcinogens like benzene. Defendant made these statements uniformly to consumers and specifically omitted any reference to benzene from all advertising, labeling, and packaging, despite knowing or having reason to know—given the well-established instability of BPO and degradation pathway—that such statements were misleading and posed serious danger to consumers' health. Accordingly, Defendant knowingly, recklessly, or at least negligently introduced misbranded BPO Products into the market, and Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

---

[118] *About PanOxyl*, PanOxyl, https://panoxyl.com/about-panoxyl/ (last accessed Jan. 9, 2026).
[119] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

187.    In sum, the BPO Products sold during the applicable class period failed to conform to the final monograph after its effective date because the Products (1) contain benzene and/or degrade to form benzene at excessive levels[120] and/or (2) are adulterated and misbranded and, thus, illegal to sell,[121] in violation of 21 C.F.R. § 330.10(b).

## VIII.    STATE LAWS PARALLEL EXISTING FEDERAL REQUIREMENTS

188.    The federal violations of the FDCA, cGMPs, and USP standards detailed in Section I provide the mandatory safety and purity benchmarks for the BPO Products, but Plaintiffs' claims for relief are brought exclusively under state law.

189.    The laws of every state and U.S. territory where Defendant's BPO Products were sold impose independent, affirmative duties on drug manufacturers. These state-law duties ensure that consumers receive drugs made in accordance with the very same cGMP and official compendium standards established under federal law. This state-level regulatory framework is "fully consistent with" federal requirements because the vast majority of these jurisdictions have enacted "mini-FDCA" statutes that explicitly adopt the federal definitions of adulteration and misbranding as the state's own legal standard.

190.    These state-law duties are "parallel" to the FDCA because they require exactly what the federal law requires: compliance with the USP and cGMPs. By distributing BPO Products that fail to meet the rigorous purity and manufacturing standards mandated by these various state-level enactments, Defendant's conduct constitutes a clear and actionable breach of the independent laws of each state where these adulterated products were sold.

---

[120] "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.]" FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs, 12/27/2023, at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[121] "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs, 12/27/2023, at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

191.    The states and territories whose statutes adopt, incorporate, or parallel[122] these federal requirements include:

- **Alaska Statutes § 17.20.080(b)** (official compendium):  "(b) A drug is adulterated if it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. The determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendium, or in the absence or inadequacy of tests or methods of assay, those prescribed under authority of the federal act."

- **Arizona Statutes §§ 32-1966(3)** (cGMPs):  "A drug … shall be deemed adulterated … (3) If the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug or device meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality, which it is represented to possess."

- **California Health and Safety Code §§ 110105** (cGMPs):  All good manufacturing practices regulations for any food, drug, device, or cosmetic and any amendments to the regulations adopted pursuant to the federal act in effect on November 23, 1970, or adopted on or after such date, are the good manufacturing practices regulations of this state. If the department finds that it is necessary for the protection of consumers, it may adopt interpretative regulations as necessary to define 'current good manufacturing practice' as used in this part."

- **Colorado Statutes §§ 25-5-414(1)(c)** (cGMPs):  "A drug … shall be deemed adulterated… (c) If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this part 4 as to safety and that such drug has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess[.]"

- **Connecticut General Statute § 21a-105** (cGMPs and official compendium):  "A

---

[122] To be parallel to federal law, a state-law claim need only be "equivalent to, and fully consistent with," federal law. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005). It need "not be phrased in the *identical* language as its corresponding [federal] requirement." *Id*. at 454 (emphasis in original). *See also Hardeman v. Monsanto Co.*, 997 F.3d 941, 955 (9th Cir. 2021) (quoting *Bates, supra*, for same proposition).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

drug … shall be deemed to be adulterated: … (6) if it has not been manufactured in accordance with good manufacturing practices as defined in the federal Food and Drug Act Parts 211 and 820; (b) if it purports to be, or is represented as, a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium[.]"

• **Title 16, Delaware Code §§ 3303** (cGMPs and official compendium):  "A drug is deemed to be adulterated … (3) If it violates the definition of adulteration as stated in the Federal Food, Drug and Cosmetic Act."

• **District of Columbia Code § 48-103(1)** (official compendium): "An article shall be deemed to be adulterated within the meaning of this chapter: (1) In the case of drugs: (A) if, when sold under or by a name recognized in the United States Pharmacopoeia, it differs from the standard of strength, quality, or purity laid down in the edition thereof at the time official[.]"

• **Florida Statutes §§ 499.006(3)** (cGMPs):  "A drug or device is adulterated … if (3) It is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, current good manufacturing practices to assure that the drug meets the requirements of this part and that the drug has the identity and strength, and meets the standard of quality and purity, which it purports or is represented to possess."

• **Georgia Code § 26-3-7(2)** (official compendium):  "A drug … shall be deemed to be adulterated … (2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium and its strength differs from or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or, in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act."

• **Guam Statutes 10 G.C.A. § 40114(3), (7)** (cGMPs and official compendium):  "A drug or device shall be deemed to be adulterated: …
(3) If it is a drug and the methods used in or the facilities or controls used for its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess; …

(7) If it purports to be or is represented as a drug the name of which is recognized in

66
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

an official compendium, and its strength differs from or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the Federal Act."

• **Hawaii Revised Statutes §§ 328-14(1)(B)(ii), 328-14(2)** (cGMPs and official compendium): "A drug … shall be deemed to be adulterated … (1)(B)(ii) If the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that the drug or device meets the requirements of this part as to safety and has the identity and strength, and meets the quality and purity characteristics which it purports or is represented to possess; or

… (2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. Such a determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendium, or in the absence of or inadequacy of these tests or methods of assay, those prescribed under authority of the Federal Act."

• **Idaho Code § 37-126(b)** (official compendium):  "A drug ... shall be deemed to be adulterated ... (b) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or in the absence of or inadequacy of such tests or methods of assay, these prescribed under authority of the federal act."

• **Chapter 410, Illinois Statute § 620/14** (cGMPs and official compendium) ("A drug ... is adulterated ... (a)(2)(B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the [federal] Act as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess; or

…(b) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the Federal Act.").

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

• Indiana Statute § 16-42-3-3(3) ) (good manufacturing practices) ("A drug ... is considered to be adulterated ... (3) (3) If the methods used in or the facilities or controls used for a drug's manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that: (A) the drug meets the requirements of this article as to safety; and (B) the drug: (i) has the identity and strength; and (ii) meets the quality and purity characteristics; that the drug purports or is represented to possess.

• **Iowa Code §§ 126.9(1)(c)** (cGMPs):  "A drug...is adulterated...c. If it is a drug and the methods used in, or the facilities or controls used for its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that the drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."

• **Kansas Statutes § 65-668(a)(2)(B)** (cGMPs):  "A drug … shall be deemed to be adulterated … if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"

• **Kentucky Statute § 217.055(2)** (official compendium):  "A drug … shall be deemed to be adulterated … (2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act."

• **Louisiana Revised Statute tit. 40, § 616(5)** (official compendium): "A drug is considered adulterated if it has been found to be such by any department of the United States government, or … (5) If its name is recognized in the official compendium, or if it purports to be a drug the name of which is so recognized, and it differs from the standard of strength, quality, or purity as determined by the tests or methods of assay set forth in the official compendium or in the regulations of the department, unless its standard of strength, quality, or purity is plainly stated on its label."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

• **Maryland Code, Health–General §§ 21-216(c)(6)(2), 21-256(1)** (cGMPs and official compendium):  "For purposes of this subtitle, a drug … is adulterated if … (c)(6) It is purported to be a drug the name of which is recognized in an official compendium and: (i) The strength of the drug differs from, or the quality or purity of the drug falls below, the standard set in the official compendium; and (ii) The difference in strength, quality, or purity is not stated plainly on its label; or

(7) Although not purported to be a drug recognized in an official compendium, the strength of the drug differs from, or the quality or purity of the drug falls below that which the drug purports to possess. …

(d)(1) For purposes of administering subsection (c)(6) of this section, any determination as to whether the strength of a drug differs from or as to whether its quality or purity falls below the standard set in an official compendium shall be made in accordance with the tests or methods of assay set forth in the official compendium, or, in the absence of or inadequacy of those tests or methods of assay, those provided under the federal act."

• **Massachusetts General Laws chapt. 94 § 186** (official compendium):  "For the purposes of this chapter, an article shall be deemed to be adulterated: In the case of a drug: First, if a drug sold under or by a name recognized in any official compendium differs from the standards of strength, quality or purity as determined by the test, if any, laid down in such official compendium at the time of investigation….[T]he term 'official compendium' shall mean the official United States pharmacopoeia, the official homeopathic pharmacopoeia of the United States, the official national formulary, or any supplement to any of them."

• **Minnesota Statutes § 151.35(1)** (cGMPs):  "A drug shall be deemed to be adulterated: (1) if it consists in whole or in part of any filthy, putrid or decomposed substance; or if it has been produced, prepared, packed, or held under unsanitary conditions whereby it may have been rendered injurious to health, or whereby it may have been contaminated with filth; or if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice as required under the federal act to assure that such drug is safe and has the identity, strength, quality, and purity characteristics, which it purports or is represented to possess[.]"

• **Missouri Statutes § 196.095(5)** (official compendium):  "A drug … shall be deemed to be adulterated: (5) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the

federal act."

• **Montana Code § 50-31-305(3)** (cGMPs): "A drug or device shall be deemed to be adulterated if it: … (3) is a drug and the methods used in or the facilities or controls used for its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess[.]"

• **Nebraska Revised Statutes** § 71-2461(2) (official compendium): "Adulterated drug means an article (1) if, when a drug is sold under or by the name recognized in The United States Pharmacopeia and The National Formulary, it differs from the standard of strength, quality, or purity as determined by the test laid down in The United States Pharmacopeia and The National Formulary official at the time of investigation[.]"

• **Nevada Statutes § 585.380(1)** (official compendium): "1. A drug shall be deemed to be adulterated if it is represented as a drug, the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. The determination as to strength, quality or purity must be made in accordance with the tests or methods of assay set forth in the compendium or, in the absence of or inadequacy of those tests or methods of assay, those prescribed pursuant to the Federal Act."

• **New Hampshire Revised Statutes §§ 146:II and 146:4(V)** (cGMPs and official compendium): "A drug or device shall be deemed to be adulterated … II. If it purports to be or is represented as a drug, the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act.

…V. If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."

• **New Jersey Statute 24:5-10(b)** (official compendium): "For the purposes of this subtitle a drug or device shall be deemed adulterated: … b. If it purports to be or is

70

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with tests or methods of assay set forth in such compendium or in the absence of or inadequacy of such tests or methods of assay, those prescribed by the agency enforcing the Federal Act."

• **New Mexico Statutes §§ 26-1-3(A) and 26-1-10(A):**  (cGMPs and official compendium) ("A drug … shall be deemed to be adulterated:
A. if it consists in whole or in part of any filthy, putrid or decomposed substance; or if it has been produced, prepared, packed or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or if it is a drug and the methods used in, or the facilities of controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the New Mexico Drug and Cosmetic Act [New Mexico Drug, Device and Cosmetic Act] as to safety and has the identity and strength, and meets the quality and purity characteristics which it purports or is represented to possess….

B. if it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality and purity shall be made in accordance with the tests or methods of assay set forth in such compendium or in the absence of or inadequacy of such tests or methods of assay, those prescribed under the authority of the federal act."

• **New York Education Law § 6815(b)** (official compendium):  "A drug … shall be deemed to be adulterated: b. If it purports to be, or is represented as, a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or, in the absence or inadequacy of such tests or methods of assay, then in accordance with tests or methods of assay prescribed by regulations of the board of pharmacy as promulgated under this article[.]"

• **North Carolina Statutes §§ 106-133(1)(e), (2)** (cGMPs and official compendium): "A drug … shall be deemed to be adulterated: … e. If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Article as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess. ….

71
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those so prescribed under authority of the federal act."

• **North Dakota Century Code §§ 19-02.1-13(3) and 19-02.1-13(6)**: (cGMPs and official compendium):  "A drug must be deemed to be adulterated: … 3. If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess. . . . 6. If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity must be made in accordance with the tests or methods of assay set forth in such compendium or, in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act."

• **Ohio Code § 3715.52(A)(5)** (official compendium):  "(A) A drug or device is adulterated … (5) It purports to be or is represented as a drug the name of which is recognized in the United States pharmacopoeia and national formulary, or any supplement to them, and its strength differs from or its quality or purity falls below the standard set forth in those compendiums. A determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendiums, or in the absence or inadequacy of such tests or methods of assay, those prescribed under the authority of the 'Federal Food, Drug, and Cosmetic Act.'"

• **Oklahoma Statutes title 63 § 1-1408(5)** (official compendium):  "A drug … shall be deemed to be adulterated: … 5. If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or, in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act."

 • **Oregon Statute 689.527(3)-(4)** (official compendium):  "(3) A person may not adulterate for the purpose of sale any drug in such manner as to render it injurious to health, or knowingly sell or offer for sale any adulterated drug.

72

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(4) A person may not manufacture, compound or sell or offer for sale or cause to be manufactured, compounded, sold or offered for sale any drug, compound or preparation for internal or external use under or by a name recognized in the United States Pharmacopoeia, Homeopathic Pharmacopoeia or National Formulary which differs from the standard of strength and purity specified therein as official at the time of manufacture, compounding, sale or offering for sale."

• **Title 35, Pennsylvania Statutes § 781(5)** (official compendium):  "A drug shall be deemed to be adulterated within the meaning of this act:… 5. If the drug shall be so altered that the nature, quality, substance, commercial value or medicinal value of it will not correspond to the recognized formulae or tests of the latest edition of the "National Formulary," or of the "Pharmacopoeia of the United States," or the American Homeopathic Pharmacopoeia, or the American Homeopathic Dispensatory, regarding quality or purity."

• **Title 21, Rhode Island General Laws § 21-31-14(2)** (official compendium):  "A drug … shall be deemed to be adulterated: … (2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. A determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendium, or in the absence of or inadequacy of the tests or methods of assay, those prescribed under authority of the Federal Act."

• **South Carolina Code §§ 39-23-30(a)(2)(B), 39-23-30(b)** (cGMPs and official compendium):  "A drug … shall be deemed to be adulterated: … if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the Federal Food, Drug, and Cosmetic Act, as amended, as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]" …

(b) If it purports or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, except that whenever tests or methods of assay have not been prescribed in such compendium, or those prescribed under authority of the Federal act[.]"

• **South Dakota Code Statute § 39-15-2** (official compendium):  "For the purposes of this chapter a drug shall be deemed adulterated if, when sold under or by a name

73
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

recognized in the United States Pharmacopoeia or National Formulary, it differs from the standard of strength, quality, or purity as determined by the test laid down in such pharmacopoeia or formulary, at the time of investigation[.]"

**• Texas Health & Safety §§ 431.111(a)(2)(B), (b)** (cGMPs and official compendium): "A drug … shall be deemed to be adulterated: … (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess; or

… (b) if it purports to be or is represented as a drug, the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standards set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under the authority of the federal Act."

**• Title 18, Vermont Statutes § 4063(2)** (official compendium): "A drug or device shall be deemed to be adulterated: … (2) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. The determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendium, or in the absence of or inadequacy of the tests or methods of assay, those prescribed under authority of the federal act."

**• Virginia Code § 54.1-3461(A)(3), (B)** (cGMPs and official compendium): "A. A drug or device shall be deemed to be adulterated: … 3. If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter; . . .

B. A drug or device shall be deemed to be adulterated if it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination of strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act. …Whenever a drug is recognized in both the United States Pharmacopoeia National Formulary and the Homeopathic Pharmacopoeia of the United States it shall be subject to the requirements of the United States

Pharmacopoeia National Formulary."

• **Washington Statute § 69.04.420** (official compendium): "If a drug or device purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium, it shall be deemed to be adulterated. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or prescribed by regulations promulgated under section 501(b) of the federal act."

• **West Virginia Code §§ 16-7-2(a)(1)** (official compendium): "Any drug … shall be deemed to be adulterated within the meaning of this article: (a) In the case of drugs: (1) If, when sold under or by a name recognized in the United States Pharmacopoeia official at that time, it differs from the standard of strength, quality, or purity laid down therein[.]"

• **Wyoming Statutes §§ 35-7-116** (cGMPs and official compendium): "A … drug is adulterated if it is adulterated under the federal act."

## IX.     INJURIES TO PLAINTIFFS AND CLASS MEMBERS

192.    When Plaintiffs purchased Defendant's BPO Products, Plaintiffs did not know, and had no reason to know, that Defendant's BPO Products contain and/or degrade to form the potentially harmful carcinogen benzene. Not only would Plaintiffs not have purchased, or paid less for, Defendants' BPO Products had they known the Products contain and/or degrade to form benzene, but they would also not have been capable of purchasing the Products if Defendant had done as the law required and tested the Products for benzene.

193.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendant to truthfully and honestly report on the BPO Product's packaging and labeling what the Products contain.

194.    Given Defendant's position as a leader in the acne treatment market, Plaintiffs and Class members trusted and relied on Defendant's representations and/or omissions regarding its BPO Products.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

195.    Here, Defendant's misrepresentations and/or omissions were material. Plaintiffs and Class members made purchasing decisions based on Defendant's advertising and representations, including representations and/or omissions on the BPO Products' labeling with respect to the ingredients, warnings, and other information contained therein. To be sure, the decision to purchase (or not purchase) BPO Products that contain and/or degrade into benzene at any level is a financial and healthcare decision that affects Plaintiffs and Class members in a very personal and individual way. And it is perfectly reasonable for consumers to be concerned about potential carcinogens contained in the products they purchase and put onto and into their bodies.

196.    Plaintiffs and Class members have been denied the opportunity to make such informed financial and healthcare decisions due to the Defendant's misconduct, and instead unwittingly purchased and used BPO Products they would have not have otherwise purchased, or paid less for, absent Defendant's misconduct. Plaintiffs and the Class members' injuries are therefore traceable to Defendant's acts and/or omissions.

197.    As alleged, Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class members.

198.    Plaintiffs and Class members bargained for products free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the BPO Products because the Products are worthless. Specifically, the BPO Products are misbranded, adulterated with harmful levels of benzene, and thus illegal to sell, yet Defendant failed to warn consumers of this fact.

199.    As a proximate result thereof, Plaintiffs and Class members are entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

200.    All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## CLASS ALLEGATIONS

201.    Plaintiffs, individually and on behalf of all others similarly situated, bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). Plaintiffs seek to represent Classes defined as:

**Multi-State Class**

All consumers who purchased PanOxyl benzoyl peroxide products in the United States of America and its territories from March 8, 2020 to the present for personal or household use within the applicable limitations period.

202.    In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the following state Subclasses:

**Arizona Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Arizona from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**California Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of California from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Connecticut Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Connecticut from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Florida Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Florida from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Illinois Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Illinois from March 8, 2020, to the present for personal or household use within the applicable limitations period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Louisiana Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Louisiana from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Maryland Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Maryland from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Massachusetts Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Massachusetts from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Missouri Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Missouri from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Nevada Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Nevada from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**New York Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of New York from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Ohio Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Ohio from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Pennsylvania Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Pennsylvania from March 8, 2020, to the present for personal or household use within the applicable limitations period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Rhode Island Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Rhode Island from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Washington Subclass**

All persons who purchased PanOxyl benzoyl peroxide products in the State of Washington from March 8, 2020, to the present for personal or household use within the applicable limitations period.

203. Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

204. Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

205. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains hundreds of thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

206. *Commonality*: Questions of law or fact common to the Class include:

a. Whether the BPO Products contain benzene;

b. Whether a reasonable consumer would consider the presence of benzene in the BPO Products to be material;

c. Whether Defendant knew or should have known that the BPO Products contains benzene;

d. Whether Defendant misrepresented the BPO Products contain or degrade into benzene;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

e.  Whether Defendant failed to disclose that the BPO Products contain or degrade into benzene;

f.  Whether Defendant concealed that the BPO Products contain or degrade into benzene;

g.  Whether Defendant engaged in unfair or deceptive trade practices;

h.  Whether Defendant violated the state consumer protection statutes alleged herein;

i.  Whether Defendant was unjustly enriched; and

j.  Whether Plaintiffs and Class members are entitled to damages.

207.  *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

208.  *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

209.  *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

likely to be encountered in the management of this action that would preclude its maintenance as a class action.

210. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

### (VIOLATIONS OF THE UNFAIR COMPETITION LAW (THE "UCL"), CAL. BUS. & PROF. CODE § 17200, *ET SEQ., INDIVIDUALLY AND ON BEHALF OF THE CALIFORNIA SUBCLASS*)

211. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

212. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California Subclass, all of whom are similarly situated consumers.

213. California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*, prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising." Defendant regularly transacts business in California, including in this District, and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

214. Defendant misrepresented its BPO Products in advertising, labels, and containers and misled Plaintiffs, the Subclass, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the Products. Defendant led Plaintiffs, the Subclass, and the public to believe the BPO Products were safe and had characteristics, purity, and quality that the Products did not have.

215. Defendant's advertising, online representations, labeling, and packaging of the BPO Products were misleading, fraudulent, and deceptive. Defendant knew through the Products' development, formulation, research, and pre-sale safety and stability testing, the Products were not chemically and physically stable when exposed to common temperature conditions. Defendant knew or should have known the Products formulated benzene under normal and expected consumer use, handling, and storage conditions, and that consumers would be exposed

81

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

to benzene. Defendant were specifically reminded by the FDA of their obligation to ensure the safety and quality of its BPO Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the Products without substantiating their safety, or warning Plaintiffs, the Class, and the public about benzene.

216.    Defendant omitted material health and safety information (e.g. the presence of benzene) from the Products' advertising, label, container, and warnings. Defendant did not tell Plaintiffs and the Class members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

217.    Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about what ingredients and potential contaminants are contained in BPO Products. Reasonable consumers certainly expect that known human carcinogens in the Products be disclosed. Reasonable consumers further expect drugs to be free of known human carcinogens, unless told otherwise. That benzene is contained in a widely marketed drug product used by children, teens, adults and the public in general is material health information reasonable consumers expect to be told.

218.    Had Defendant been truthful in their advertising, labeling, packaging, and online statements about benzene in the BPO Products, or the risk that such Products would degrade into benzene, Plaintiffs and the Subclass members would not have bought the Products, or paid less for them.

219.    Defendant's acts, omissions, and/or concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products and/or the fact that the Products could degrade to form benzene. Defendant continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

220.    Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such as benzene in the BPO Products and the consumers' risk of harm from using the Products is unethical, unscrupulous, and offensive.

221.    Plaintiffs and the Class members suffered ascertainable economic losses because of Defendant's misconduct because they bought the Products they would  otherwise would not have bought, or paid less for, but for Defendant's misrepresentations and/or affirmations of safety.

222.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq*., including an injunction to enjoin Defendant from continuing their fraudulent and deceptive business practices. The damages sought are ascertainable, uniform to Plaintiffs and the Subclass, and can be measured and returned to the Subclass members.

## COUNT II

### (VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT (THE "CLRA"), CAL. BUS. & PROF. CODE § 1750, *ET SEQ., INDIVIDUALLY AND ON BEHALF OF THE CALIFORNIA SUBCLASS*)

223.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

224.    Plaintiffs bring this cause of action on behalf of themselves, and the California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

225.    Defendant's acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant. Defendant regularly transacts business in California, including in this District, and has engaged in misconduct that has had a

direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

226.    California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.* prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendant violated several prohibitions of CIV. CODE § 1750(a).

227.    Defendant violated CAL. CIV. CODE § 1750(a)(2) by representing (1) the source, sponsorship, and approval, of the BPO Products (*e.g.*, the Products were "always backed by science"), (2) that Defendant met its obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public, and (3) the Products only contained the active and inactive ingredients listed, and were free of defects (i.e. known human carcinogens).

228.    Defendant violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another (*e.g.*, that the BPO Products were approved by dermatologists and manufactured in conformity with cGMPs.

229.    Defendant violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations (*e.g.*, that the Products were pure, of good quality, safe, validated, only contained the active and inactive ingredients disclosed, supported by the latest research, and free from latent defects such as benzene).

230.    Defendant violated CAL. CIV. CODE § 1750(a)(5) by representing the Products have characteristics, ingredients, uses, or benefits, which they do not (*e.g.*, misleading Plaintiffs and the Class members that the BPO Products only contained the listed active and inactive ingredients, did not contain latent defects (i.e. benzene), and did not increase the risk of harm from using the Products).

231.    Defendant violated CAL. CIV. CODE § 1750(a)(6) by representing the Products were not deteriorated unreasonably or altered (*e.g.*, that the Products were pure and did not contain benzene and/or degraded to form benzene).

232.    Defendant violated CAL. CIV. CODE § 1750(a)(7) by representing the Products were pure and of a particular standard or quality, when they are not.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

233.    Defendant violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the intent not to sell them as advertised (*e.g.*, that the Products were of pure quality, safe, made in conformity with cGMPs, and not adulterated.

234.    Had Defendant been truthful in their advertising, labeling, packaging, warnings, and online statements about benzene in the BPO Products and the risk inherent therein, Plaintiffs and the California Subclass members would not have bought the Products, or paid less for them. That benzene, a known human carcinogen, was present in a widely marketed and available consumer drug product, is material health and safety information Defendant knew Plaintiffs, the Subclass members, and the public would want to know. The Defendant's omission of this material information was common to Plaintiffs and all Subclass members and was made to Plaintiffs and all Subclass members uniformly through common advertising, online representations, labeling, and packaging.

235.    Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continue to cause harm. Defendant continue to market, advertise, and sell the BPO Products to the public without telling the public about the presence of benzene in the Products and the risks inherent therein.  Further, Defendant continues to market itself as a responsible drug manufacturer and seller who sells safe products when they have not quantified the levels of benzene contained in and/or created in the Products during normal and expected storage conditions.

236.    Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such those presented by exposure to benzene in the BPO Products is unethical, unscrupulous, and offensive.

237.    Plaintiffs and the California Subclass members suffered ascertainable economic losses as a result of Defendant's misconduct because they bought BPO  Products they would not have otherwise bought, or paid less for, but for Defendant's misrepresentations.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

238. Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the California Subclass seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable under CAL. CIV. CODE § 1750, *et seq*., including an injunction to enjoin Defendant from continuing its fraudulent business practices. The damages sought are ascertainable, uniform to the Subclass and can be measured and returned to the Subclass members.

## COUNT III

### (FALSE ADVERTISING UNDER VARIOUS STATE STATUTES, *INDIVIDUALLY AND ON BEHALF OF THE CALIFORNIA AND NEW YORK SUBCLASS*)

239. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

240. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California and New York Subclasses, all of whom are similarly situated consumers.

241. Defendant develops, tests, selects, markets and/or sells the BPO Products throughout the United States in its stores and through e-commerce websites. Defendant knew through the Products' development, formulation, and selection that the Products were not chemically stable when exposed to certain expected and normal environmental and storage conditions and formed benzene, as a toxic byproduct. Despite this knowledge, Defendant did not mention benzene in the Products' advertising, ingredient lists, labels, containers, or warnings. Defendant did not tell Plaintiffs or Subclass members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' containers closed.

242. That benzene, a known human carcinogen, is present in the BPO Products is material health and safety information Defendant knew Plaintiffs, and the Subclass members would want to know. Defendant not only omitted this material human health and safety information from advertising, online representations, blogs, labeling, packaging, and warnings, but aggressively marketed itself as a consumer conscious, market leader, company committed to consumer safety. Defendant's brand notoriety, market share, and affirmations of safety misled

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, and the Subclass members, leading them to believe the BPO Products were tested, verified, and safe. Defendant further marketed the BPO Products by touting the approval of dermatologists, who were not aware of the presence of benzene in the Products. In doing so, Defendant omitted from its marketing any reference to the fact that it refused or failed to conduct adequate and meaningful testing before marketing and selling the Products to the public, even after the FDA's 2022 alert "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications."

243.    Defendant's acts and/or omissions constitute false advertising. Defendant advertised the BPO Products with the intent not to sell them as advertised. Reasonable consumers, including Plaintiffs and the Subclass members, exposed to Defendant advertising would believe the Products were safe, verified, and free of benzene.

244.    Defendant's false and misleading advertising violated California's False Advertising Law, Bus. & Prof. Code § 17500 *et seq*., which prohibits Defendant from disseminating statements "which are untrue or misleading, and which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Defendant knew or should have known the BPO Products contained benzene and/or formed benzene under normal, handling, use, and storage conditions, but did not disclose this to Plaintiffs and the Class and Subclass members. Defendant also knew or should have known the BPO Products were not chemically stable when exposed to certain normal and expected environmental conditions.

245.    Defendant's false and misleading advertising violated New York's General Business Law § 350 et seq. ("GBL § 350"), which prohibits "[f]alse advertising in the misconduct of any business, trade or commerce or in the furnishing of any service" in New York. Under GBL § 350; "false advertising" includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." Defendant violated GBL § 350 by advertising and selling the BPO Products without disclosing material health and safety information (*e.g*., that the products contain benzene and/or degrade to form benzene and the risks inherent therein).

Defendant's false and misleading advertising was directed at consumers, the New York Subclass members, and the public, and caused consumer injury and harm to the public interest.

246. Had Defendant been truthful in their advertising, online representations, labeling, and packaging about benzene, Plaintiffs, and the Subclass members would not have bought the BPO Products, or would have paid less for them.

247. Plaintiffs, on behalf of themselves, and the California and New York Subclass members suffered ascertainable economic losses because of Defendant's misconduct when they bought BPO Products they otherwise would not have but for Defendant's material misrepresentations.

248. Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the California and New York Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing their fraudulent business practices. The damages sought are ascertainable, uniform, and can be measured and returned to the Subclass members.

## COUNT IV

### (DECEPTIVE TRADE PRACTICES UNDER VARIOUS STATE STATUTES,

*Individually, and on Behalf of the Nationwide Class and the Arizona, California, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, Nevada, New York, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses*

249. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

250. Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and all members of the Arizona, California, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, Nevada, New York, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

251. Defendant's acts and omissions constitute deceptive business practices in violation of state deceptive trade practices laws.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

252. Defendant represented the BPO Products had characteristics, uses, and benefits, they did not have. For example, Defendant represented the BPO Products were pure, of good quality, safe, and only contained the active and inactive ingredients disclosed.

253. Defendant represented the BPO Products were not deteriorated or altered, when they knew, or should have known, the BPO Products contain benzene and/or degrade to form benzene under normal and expected use, handling, and storage conditions.

254. Defendant advertised the BPO Products with the intent not to sell them as advertised.

255. Defendant's acts and omissions violated Arizona's Consumer Fraud Act, 44 A.R.S. § 1521, *et seq*., which makes it unlawful for a seller to engage in any deception, deceptive or unfair act or practice, false statement, false pretense, false promise, misrepresentation, or concealment or omission of any material fact, in connection with the sale or advertisement of any merchandise, including goods.

256. Defendant's acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant.

257. Defendant's acts and omissions violated Connecticut's Unfair Trade Practices Act, CONN. GEN STAT. ANN., § 42- 110, et seq., which broadly prohibits Defendant from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce such as those committed by Defendant and alleged in this class action.

258. Defendant's acts and omissions violated Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*., which broadly protects the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, and renders such conduct unlawful.

259. Defendant's acts and omissions violated Illinois' Consumer Fraud and Deceptive Business Practices Act ("ICFA") , 815 ILCS 505/1 *et seq*. Defendant's used deception, fraud, false pretense, false promises, and omitted material health and safety information about the BPO

89

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Products' containing benzene and/or degrading into benzene, and/or contamination with benzene, which Defendant intended the Illinois Subclass members to rely upon, in violation of the ICFA.

260.    Defendant's acts and omissions violated Louisiana's Redhibition Act, La. C.C. Art. 2520, *et seq*., because the BPO Products contain a defect (i.e. benzene) that "renders the thing useless, or its use so inconvenient" that it has to be presumed that the buyer would not have bought the thing had he known of the defect or (2) when, "without rendering the thing totally useless," the defect diminishes the product's usefulness or its value such that it must be presumed that the buyer would still have bought it but for a lesser price.

261.    Defendant's acts and omissions violated Maryland's Unfair or Deceptive Trade Practices Act, MD. COM. CODE, Title 13, Subtitle 3, §13-301 because Defendant: (1) represented the BPO Products had characteristics, ingredients, uses, and benefits, they did not; (2) represented the Products were not deteriorated or altered, when they were; (3) represented the Products were of a particular standard or quality, when they were not. Defendant's representations about the Products' ingredients and/or omission of the presence of benzene in the Products were misleading, deceptive, incomplete, and not truthful, in violation of Maryland's Unfair or Deceptive Trade Practices Act.

262.    Defendant's acts and omissions violated Massachusetts consumer protection law, MASS. GEN. LAWS ANN. Ch. 93A, § 1 et seq., which broadly prohibits unfair and deceptive trade practices such as those committed by Defendant and alleged in this class action.

263.    Defendant's acts and omissions violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407, *et seq*., which prohibits the use of deception, fraud, misrepresentations, or unfair practices by a business—for example, marketing the BPO Products as safe, approved, tested, and only containing the listed ingredients. Missouri's law further prohibits the suppression or omission of material facts such as the BPO Products' containing benzene and/or degrading into benzene.

264.    Defendant's acts and omissions violate Nevada Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*., which prohibits Defendant from making

false statements about its BPO Products and advertising the Products without the intent to sell them as advertised.

265.    Defendant's acts and omissions violated N.Y. GEN. BUS. LAW § 349, which prohibits Defendant from engaging in deceptive, unfair, and misleading acts and practices such as those committed by Defendant and alleged in this class action. Defendant's misrepresentations and omissions caused consumer injury and harm to the public interests of protecting public health and the public's right to know about any harmful constituents in the BPO Products.

266.    Defendant's acts and omissions violated Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01, et seq. which prohibits sales practices that are deceptive, unfair, or unconscionable, and Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN.§ 4165 *et seq*., which prohibits a person from (1) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, (2) representing that goods are of a particular standard, quality, or grade, if they are of another, and (3) advertising goods with intent not to sell them as advertised.

267.    Defendant's acts and omissions violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 et seq. because Defendant: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the BPO Products; (2) used deceptive representations about the Products; (3) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were; (4) represented the Products were particular standard or quality when they are not; and (5) advertised the Products with the intent not to sell them as advertised.

268.    Defendant's acts and omissions violated Rhode Island's Deceptive Trade Practices Act, R.I. GEN. LAWS § 6- 13.1- 5.2(B), et seq. because Defendant: (1) caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the BPO Products; (2) used deceptive representations in connection with the Products; (3) represented the Products had sponsorship, approval, characteristics, ingredients, uses, benefits, they did not; (4) represented the Products were not deteriorated or altered, when they were; (5) represented the

Products were of a particular standard, quality, or grade, when they were not; and (6) advertised the Products with the intent not to sell them as advertised.

269.    Defendant's acts and omissions violated Washington's Consumer Protection Act, WASH. REV. CODE § 19.86.010, et seq., which broadly prohibits Defendant from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.[123] Defendant's concealment of material health and safety information about the BPO Products, which they knew or should have known, was injurious to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products. Defendant's conduct caused harm to the Plaintiffs, the Washington Subclass members, and members of the public who bought the Products without knowing they contain benzene and/or degrade into benzene. Defendant's conduct has the capacity to cause harm to other persons who buy the Products.

270.    Had Defendant been truthful in their advertising, labeling, and packaging of the BPO Products and not omitted material health and safety information about the presence of benzene and/or the Product degrading into benzene, Plaintiffs, the Class, and Subclass members would not have bought the Products.

271.    Defendant's acts and omissions and violations of the state consumer protection statutes are ongoing and continuing to cause harm.

272.    Plaintiffs, on behalf of themselves and the Subclasses, suffered an ascertainable economic loss as a result of Defendant's misconduct when they purchased the Products—Products they would not have purchased but for Defendant's misrepresentations.

273.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the state Subclasses seek recovery of their economic damages, attorneys' fees, punitive damages, and

---

[123] Under § 19.86.090, Washington consumers harmed by such practices may recover actual damages, the costs of the suit, including reasonable attorney's fees, and the court may, in its discretion, increase the award of damages to an amount up to three times the actual damages sustained.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

all other relief allowable under the law. The damages sought are ascertainable, uniform and can be measured and returned.

## COUNT V

### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, *INDIVIDUALLY, AND ON BEHALF OF THE NATIONWIDE CLASS AND THE CALIFORNIA, LOUISIANA, MARYLAND, MASSACHUSETTS, NEVADA, OHIO, PENNSYLVANIA, AND RHODE ISLAND SUBCLASSES*

274.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

275.    Plaintiffs bring this cause of action individually and on behalf of (1) all consumers who purchased BPO Products directly from Defendant (for which there is privity), (2) all consumers who whose state law has abrogated the privity requirement for implied warranty of merchantability claims seeking economic loss, and (3) all California Subclass members.

276.    Defendant impliedly warranted that its BPO Products were merchantable, fit and safe for ordinary use.

277.    Under California law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

278.    A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Cal. Com. Code § 2104(1).

279.    Defendant is a "merchant" within the meaning of Cal. Com. Code § 2104(1).

280.    "Goods" includes "all things (including specifically manufactured goods)[.]" Cal. Com. Code § 2105(1). The BPO Products are "goods" under the California Code.

281.    To be merchantable the goods, among other things, must be (1) "fit for the ordinary purposes for which such goods are used" and (2) "adequately contained, packaged, and labeled[.]" Cal. Com. Code § 2314(2)(c), (e). Defendant has violated these implied warranties.

93

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

282.    First, Because the BPO Products contain benzene and/or degrade to form benzene, including at levels that exceed the FDA's safe harbor exception, they are not fit for the ordinary purposes for which such Products are used.

283.    Indeed, the levels of benzene contained in the BPO Products has been indisputably linked to negative health consequences.124

284.    Second, as alleged, the BPO Products were not adequately labeled because they did not disclose that they contain benzene and/or degrade into benzene.

285.    California recognizes an exception to the privity requirement in breach of implied warranty claims pertaining to drug products where the products are unfit for human consumption or use. In California, implied warranties run with drugs to the ultimate consumer. As noted, the warranty here is that the drug is merchantable, fit, and safe for its intended purpose—that is, for human use or application as an acne treatment product.

286.    Plaintiff and members of the Class purchased the BPO Products in reliance upon the fact that the Products were merchantable, fit, and safe for ordinary use for which they were sold. They were not. The defect in the BPO Products (i.e. the presence of benzene) render the Products unfit for human use or application as an acne treatment product. As such, Plaintiffs meet the drug exception to the privity requirement recognized in California.

287.    Moreover, the BPO Products were not altered by Plaintiff or members of the Class; Plaintiff and members of the Class were foreseeable users of the BPO Products; and Plaintiff and members of the Class used the BPO Products in the manner intended.

288.    In sum, the BPO Products did not measure up to the promises or facts stated in the labeling, written literature, media advertisements and communications by and from Defendant.

289.    Contrary to Defendant's implied warranties, the BPO Products were defective, unmerchantable, and unfit for their ordinary use when sold.

---

[124] CDER Health Hazard Evaluation, July 8, 2021, available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

290.    By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

### COUNT VI

### (NEGLIGENT MISREPRESENTATION/OMISSION, *INDIVIDUALLY AND ON BEHALF OF THE NATIONWIDE CLASS AND CALIFORNIA, PENNSYLVANIA AND MASSACHUSETTS SUBCLASSES)*

291.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

292.    Plaintiffs bring this claim individually, on behalf of the Nationwide Class and Subclasses.

293.    Through its labeling and advertising, Defendant made representations to the Plaintiffs and the Class members concerning the quality, safety, and purity characteristics of its BPO Products.

294.    Defendant had a common law duty to provide accurate and non-misleading information to consumers with respect to the quality, safety, and purity characteristics of its BPO, including defects, and to not omit such material quality, safety, and purity characteristic information. More specifically, Defendant had the duty and obligation not to sell products that were adulterated with benzene. This duty existed independently from any contractual obligations between the parties.

295.    Defendant breached its duty to accurately disclose in its labeling and advertising that the BPO Products contain benzene and/or degrade into benzene.

296.    As a manufacturer, Defendant also had a common law duty (and a duty under appliable drug safety laws) to use reasonable care in the design and manufacture of its BPO Products, including the duty to perform reasonable tests and inspections of its Products to discover latent defects (such as the presence of benzene). This duty existed independently from any contractual obligations between the parties.

297.    Defendant is an expert in the field who had exclusive knowledge of the defect (i.e. benzene) that gave rise to the duty to disclose. Conversely, Plaintiffs are unsophisticated

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

consumers who do not have the same level of sophistication or knowledge or access to the same information regarding defects as the Defendant manufacturer.

298.    Defendant breached its duty to perform reasonable tests and inspections of its BPO Products for latent defects (i.e. the presence of benzene) prior to selling those Products to consumers such as Plaintiffs and Class members.

299.    Defendant had a common law duty to not make false representations or deceive consumers with respect to its BPO Products. This duty existed independently from any contractual obligations between the parties.

300.    Defendant breached its duty when it made false representations regarding the quality, safety, and purity characteristics about its BPO Products.

301.    Such failures to disclose on the part of Defendant amount to negligent omission and the representations regarding the quality, safety, and purity characteristics of the BPO Products amount to negligent misrepresentation.

302.    Plaintiffs and the other Class and Subclass members reasonably relied upon all such representations and omissions to their detriment.

303.    Moreover, Plaintiffs were foreseeable victims of Defendant's misconduct. Defendant knew or should have known that manufacturing and selling BPO Products containing benzene rendered the Products adulterated and/or misbranded under state law and, thus, illegal to sell, and that Plaintiffs would suffer the very financial loss which ultimately occurred.

304.    Defendant's breaches of its duties were a direct and proximate cause of the economic harms to Plaintiffs and the California, Pennsylvania, and Massachusetts Subclass members.

305.    By reason thereof, Plaintiffs and the other Class and subclass members have suffered damages in an amount to be proven at trial.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## COUNT VII

### (UNJUST ENRICHMENT/QUASI-CONTRACT,[125] *INDIVIDUALLY AND ON BEHALF OF THE NATIONWIDE CLASS AND THE ARIZONA, CALIFORNIA, CONNECTICUT, FLORIDA, ILLINOIS, LOUISIANA, MARYLAND, MASSACHUSETTS, MISSOURI, NEVADA, NEW YORK, OHIO, PENNSYLVANIA, RHODE ISLAND, AND WASHINGTON SUBCLASSES)*

306.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

307.    Plaintiffs bring this cause of action individually and on behalf of the nationwide Class and the Arizona, California, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, Nevada, New York, Ohio, Pennsylvania, Rhode Island, and Washington Subclasses.

308.    Defendant enticed Plaintiffs to purchase its BPO Products through false and misleading labeling that the Products were merchantable, fit and safe to use. They were not. Instead, the BPO Products were adulterated with benzene and/or degraded to form benzene at excessive levels, rendering the Products unfit and unsafe and illegal to sell.

309.    Defendant has unjustly profited from its deceptive business practices and kept the profits from Plaintiffs and the Class and Subclass members who purchased the BPO Products.

310.    Defendant requested and received a measurable economic benefit at the expense of Plaintiffs, the Class, and Subclass members as payment for the BPO Products. Defendant accepted the economic benefits from Plaintiffs, the Class, and Subclass members knowing the economic benefit received was based on deception and omission of material human health and safety information.

311.    There is no utility in Defendant's misconduct and Defendant's enrichment from the misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect consumers against unlawful conduct.

---

[125] In California, there is not a standalone cause of action for "unjust enrichment," so California courts may "construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). The California subclass seeks to have this claim construed as a quasi-contract claim seeking restitution consistent with California law.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

312.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, and the public, seek recovery of their actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendant's BPO Products.

## PRAYER FOR RELIEF

313.    WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of Class notice;

B.    An order enjoining Defendant from selling the BPO Products;

C.    An order enjoining Defendant from suggesting or implying that they are safe for human application;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing BPO Products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.    An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

98
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

G.    An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of any wrongful or unlawful act or practice;

H.    An order requiring Defendant to pay all actual and statutory damages, including, where available, punitive damages (*e.g.* Mo. St. 407.025(2)(1), permitted under the counts alleged herein;

I.    An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

J.    An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

314.    Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 14, 2026                    Respectfully,

By: /s/ *R. Jason Richards*
**AYLSTOCK, WITKIN,**
**KREIS & OVERHOLTZ, PLLC**
R. Jason Richards, Esq. (Admitted *Pro Hac Vice*)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
jrichards@awkolaw.com
cduer@awkolaw.com


By: /s/ *R. Brent Wisner*
**WISNER BAUM LLP**
R. Brent Wisner, Esq. (SBN: 276023)
Hannah L.R. Quicksell (*pro hac vice*)
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
rbwisner@wisnerbaum.com
hquicksell@wisnerbaum.com


By: /s/ *Kiley Lynn Grombacher*
**BRADLEY GROMBACHER, LLP**

99

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Kiley Lynn Grombacher, Esq. (SBN: 245960)
31365 Oak Crest Drive, Suite 240
Westlake Village, CA 91361
Tel. (805) 270-7100
Fax: (805) 618-2939
kgrombacher@bradleygrombacher.com

By: /s/ *Kristen Cardoso*
**KOPELOWITZ OSTROW PA**
Kristen Cardoso, Esq. (SBN: 338762)
1 W. Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301
Tel. 954-525-4100
Fax: 954-525-4300
cardoso@kolawyers.com

By: /s/ *Thomas P. Cartmell*
**WAGSTAFF & CARTMELL LLP**
Thomas P. Cartmell, Esq. (Admitted *pro hac vice*)
Melody R. Dickson, Esq. (Admitted *pro hac vice*)
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel. (816) 701-1100
Fax (816) 531-2372
tcarmell@wcllp.com
mdickson@wcllp.com

By: /s/ *Mark S. Reich*
**LEVI & KORSINSKY, LLP**
Mark S. Reich, Esq.* (*Pro Hac Vice* to be filed)
Courtney E. Maccarone, Esq.* (*Pro Hac Vice* to be filed)
33 Whitehall Street, 17th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
mreich@zlk.com
cmaccarone@zlk.com
mmeyer@zlk.com

*Attorneys for Plaintiffs and the Proposed Classes*

100
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 14, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

Respectfully Submitted,

/s/ *R. Brent Wisner*

WISNER BAUM LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT